Wallace M. FUGATE, III, Petitioner-Appellant,

v.

Frederick J. HEAD, Warden, Georgia Diagnostic & Classification Prison, Respondent-Appellee.

No. 98-8930.

United States Court of Appeals,

Eleventh Circuit.

Aug. 16, 2001.

Appeal from the United States District Court for the Middle District of Georgia. (No. 97-00712-5-CV-2-WDO), Wilbur D. Owens, Jr., Judge.

Before BIRCH, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

In this appeal, petitioner-appellant Wallace M. Fugate, III seeks review of the district court's denial of his petition for a writ of habeas corpus to vacate his conviction for the 1991 murder of his ex-wife and his death sentence. He argues that his attorneys rendered ineffective assistance of counsel in both the guilt and penalty phases. We affirm the denial of his petition.

## I. BACKGROUND

The facts concerning the murder are not in dispute. The following description is taken from the opinion of the Georgia Supreme Court:

> Fugate and the victim were divorced after almost 20 years of marriage. The victim lived with their son in the former marital residence, while Fugate moved to another town to minimize the likelihood that he would find himself in violation of a restraining order prohibiting him from having contact with his former wife. However, on Saturday, May 4, 1991, Fugate went to the victim's residence while she and the son were at work. (The son worked part-time at the same business as the victim.) According to Fugate, the victim had left him a note stating she would be in South Carolina that weekend, and he thought he would repair his son's automobile while they were gone. Fugate broke into the house soon after his wife and son left for work and stayed there from 9:00 a.m. until they returned home at 5:30 that afternoon.

> When the victim and the son returned home, they noticed that the son's car had been moved. She called her sister. The son testified that when he heard a noise in the basement, he got his rifle and ordered Fugate to come out. When Fugate appeared with a revolver in his hand, the son tried to shoot him because Fugate had threatened to kill the victim "if he ever caught her alone."

> However, the son's rifle had been unloaded and disabled and would not fire. Fugate brushed past his son and went to the victim.

> According to Fugate, he was surprised by the victim's return, and went to the basement thinking he would sneak out a back door and avoid a confrontation. However, there were too many locks on the back door, so he hid, hoping they would soon leave. When he was discovered, he went upstairs to his wife, who was calling the police, "mashed down" the receiver and told her to take him to the sheriff, thinking this would defuse the situation. However, she was scared—partly because he had a gun in his hand—and attacked him before he could put it in his pocket. As they fought their

way out to her van, she knocked him down several times and tried to take away his gun. During the scuffle, the gun went off once inside the house, and a second time as he was trying to put her in her van. Both shots were accidents, according to Fugate. After the second shot mortally wounded her, he took the van and drove off.

According to the son, Fugate dragged the victim out to the van, pistol-whipping her when she resisted. He shot once in the house trying to scare her into obeying, and then, when he was unable to force her into her van, Fugate grabbed her hair, jerked her head back and shot her in the forehead. He dropped her body to the ground and drove off.

Besides the bullet wound in the forehead, the victim's body was bruised on the face, shoulders and arms and there was a blunt-force laceration on the back of her head. The son testified that Fugate had struck the victim at least 50 times before shooting her. A photograph of Fugate taken shortly after his arrest does not show that he suffered any visible cuts or bruises.

*Fugate v. State,* 263 Ga. 260, 431 S.E.2d 104, 106-07 (1993).

Attorneys Reginald Bellury and Leo Browne represented Fugate at trial. Bellury was the lead counsel in Fugate's case. At the time of Fugate's trial in April 1992, Bellury had been practicing law for seventeen years, all in the judicial circuit in which the trial was held with the exception of several months in 1975. Bellury was a prosecutor for three-and-a-half years of that time. As of the trial in this case, sixty percent of Bellury's practice was comprised of criminal work. He had handled at least ten murder cases either as a prosecutor or a defense attorney. Bellury was lead counsel in at least three death penalty cases prior to representing Fugate, although in only one of those cases did the defendant actually receive the death penalty.

Leo Browne was Bellury's co-counsel for the trial. When the original co-counsel removed himself from the case, Bellury chose Browne, with whom he shared a secretary, to assist him following the court's instruction to select a new co-counsel. Browne had been practicing law for thirty-six years as of the time of the trial. Prior to representing Fugate, Browne had been involved in cases in which the prosecution sought the death penalty but the death penalty was not imposed. Browne did not recall reading any books or attending any seminars about the death penalty.

Bellury and Browne investigated Fugate's case themselves.[1] Because the defense theory for the murder charge was that the death was an accident,[2] Bellury investigated the amount of trigger movement required to discharge the firearm but did not investigate either the alignment of the trigger or seek scientific

---

[1] Browne testified that he had never used an investigator and that he and Bellury discussed it "and decided that we really wouldn't need an investigator."

[2] Browne testified that the theory of defense was "a long term domestic upheaval situation, that they had lived in warring conditions, ... had fights galore within their marriage. And that was trying to show that there was a history of violence, [Pattie] was that type of person." Browne responded "Right" when asked whether his "goal at least then was to show that Patti Fugate had a propensity to violence."

measurement of these factors. Browne and Bellury visited with Fugate, the detectives, the murder site, the crime lab, and Fugate's girlfriend, Connie Roach. Browne interviewed Pattie Fugate's employer, David Hallman.[3]

At trial, Fugate's son Mark Fugate testified that, when Fugate saw Pattie on the telephone, "he grabbed her and started beating her ... [with] [t]he butt of his gun," and Mark "hit him with the back of [Mark's] gun." Mark said that Fugate then "grabbed her by the hair and started dragging her out of the house." As they reached the back porch steps, Pattie "grabbed a hold of the steps to hang on." "When [Mark] ran around the corner, [Fugate] pointed the gun at [him], and [Mark] stepped back, and the gun went off." Mark thought Fugate had shot Pattie but then realized that he was trying to scare her into letting go of the steps as "he jerked her out of the house." Mark said that Fugate "proceeded to get her into the driver's side of the van, ... beating her and beating her" because she was resisting. Mark said that he attempted to keep them from leaving because he "knew if he left with her, he'd kill her." Mark thought that, when Fugate realized that "he couldn't get her in[to the van], ... he tilted her head back and shot her."

Fugate testified that, once he was in Pattie's house, he called the hotel room number that Pattie had given him to confirm that she was out of state but did not reach her. He said that he called the hotel a few times, but hung up after hearing Pattie's boyfriend's voice because he believed that "she was up there with [him]." Pattie's telephone record exhibits confirmed that, during the afternoon of the murder, a number of calls were made from her residence to the hotel where she planned to stay.

Fugate testified that, after Pattie was seated in the van:

I leaned in the van. I had the pistol in the right hand, it was up on the top of the back of the van seat. And, I had my other hand on the seat of the van. And, I leaned inside the van, she just laid back and she grabbed the steering wheel and the arm rest to the van seat, and she drawed her legs up and kicked me right square in the chest with both feet as hard as she could, which caught me off guard.

...

I threw my hands up, you know, trying to keep myself from falling. And, when I did, this hand here that the pistol was in, it hit the top of the door frame on the van and it discharged.

He said that he knew that he hit his hand "pretty hard because [it] was black and blue the next day" and "felt like it was broke[n]." He clarified that the pain was not in his entire hand, but in his fingers. He explained that

---

[3]Consistent with the district court, we have adopted the spelling of "Pattie" for Fugate's ex-wife's first name. The spelling, however, varies throughout the record, and will be quoted accordingly.

the reaction of my fingers being smashed ... was to draw my hand back. And, when I did, evidently, I hit the trigger. Which I didn't have my hand on the trigger, I was holding [the] gun—you know, I palmed the gun, it wasn't like I was holding it like I was going to shoot it or anything.

Fugate asked for permission to hold the gun during the trial, and squeezed the trigger commenting that "[i]t's very easy to do."

During Fugate's cross-examination, the prosecutor compared Fugate's testimony to that of other witnesses and asked Fugate whether he had "told the jury up here you were lying to them, that you lied this morning, didn't you?" When the prosecutor asked what had happened to the note from Pattie that had the telephone number on it, Fugate responded that he did not have it because it was in the clothes that he had on the day of his arrest which had not been returned. Fugate explained that the note "was in [his] wallet to start with.... When I made the phone call, I stuck it in my shirt pocket." The prosecutor asked whether Fugate had "really made the phone call based on a little note with two telephone numbers laying there on the table by Patty's telephone. It had [Pattie's boyfriend's] number on it and a contractor's number in Monticello." Fugate responded that "[t]here wasn't a pad laying there by the telephone."

Roach testified that the jail personnel had given her some of the clothes that Fugate was wearing at the time of his arrest, but that neither the flannel shirt nor the note from Pattie were in the returned clothes. She said that she had not found the note despite Fugate's request that she look for it but confirmed that she was with Fugate when he got the note from Pattie and that it contained the hotel name.

After Fugate explained how the gun "went off the second time," the prosecutor commented: "You could sell the Golden Gate Bridge." The prosecutor stated "[o]h, that's the fourth lie now you've admitted to," after Fugate explained the differences in his statement to the police and in his testimony. The prosecutor also commented "Mr. Fugate, you made a statement ... that ... the minute you told them that you didn't want to talk to them any more, that you wanted an attorney, they shut up, and left you alone."

David Hallman, Pattie's employer, testified that Pattie and Mark usually worked on Saturdays, and both worked until shortly after 4:00 P.M. on the day of the murder. Hallman said that, if Pattie had wanted to schedule Saturday off, he was flexible and she could have "even ... asked me on Friday, as long as she had somebody ... capable [to cover for her]." He said that she had "mentioned" being off on that particular Saturday, but he did not remember the details of the conversation.

During the guilt phase closing arguments, Bellury presented the first argument and Browne presented the concluding argument. Bellury maintained that the shooting was a "[p]ure, pure accident. Extremely tragic accident.... It was a regrettable accident.... A tragic accident." Browne asserted that the shooting was "an

accidental death ... [,] an unfortunate situation, a terrible situation." He argued that Fugate had no intention of kidnaping Pattie, noting that he "deliberately tried to get to that house when she was not going to be within hundreds of miles of the place. She was going to be gone. He wasn't kidnapping [sic] Patty Fugate." Browne also analogized Pattie to a "Bengal tiger," referring to the fact that she did not fear Fugate. Browne maintained that, after Fugate suggested that they go to the sheriff's office, Pattie "fought him like a tiger. He was trying to protect himself." The prosecutor argued that there was no note, and commented that Fugate was supposed to have had on a tee-shirt, flannel shirt, and jacket on May 4. He maintained that Fugate had gotten the hotel telephone number from the table near the telephone in Pattie's home.

The jury returned a verdict of guilty for murder, burglary, and kidnaping with bodily injury, aggravated assault, and theft by taking. The penalty phase of the trial began immediately after the jury returned the guilty verdicts at 3:45 p.m. on April 29, 1992.[4]

At the penalty phase, the prosecutor did not make an opening statement and did not present any witnesses. Fugate's attorneys made no opening statement but called four witnesses: Mary Fugate, Fugate's mother; Wayne Hatcher, Fugate's niece's boyfriend; Elmos Hendrix, Roach's neighbor; and Deborah Shepherd, Roach's sister. As outlined in detail below, these four witnesses testified generally about Fugate's work history, character, and non-violent nature. Mary Fugate testified that Fugate was "an obedient child" who had never been in trouble, and she stated that he was a good father who was not violent and had always worked. She also testified that his marriage to Pattie had been stormy. Hatcher testified that he had known Fugate for about four or five years and thought that he had a "rather well character." Hatcher conceded that he had heard from his girlfriend that Fugate "harassed" his ex-wife, but he also stated that he had never known Fugate to be physically violent or seen Fugate commit any violent acts. Hendrix testified that he knew Fugate because he lived in the neighborhood and had performed some work for one of their neighbors. He said that Fugate was "mighty quiet and a mighty hard worker," and had "done some good work for me." Shepherd testified that she had known Fugate for about one and-a-half years, and that he was "very polite, ... very good with the kids. The kids really liked him, they got along with him." Shepard also stated that she had never known Fugate to be violent.

Mary Fugate, Hatcher, Hendrix, and Shepherd each indicated that they believed that Fugate should be sentenced to life. Hendrix said that Fugate should be sentenced to life because "he'd be worth something

---

[4]Neither party objected to proceeding immediately or requested a continuance.

to the State," noting that "[t]he State needs carpenters and electricians and brick masons and things." When asked on cross-examination whether he really thought that the prosecution "ought to do nothing but just let him sit around the penitentiary and carpenter [sic]," Hendrix replied, "Well, I think he deserves a chance.... I think he needs a chance because he's done a good job there for me, and I think—believe he'd be some help to the State."

The prosecution cross-examined three of these witnesses (Hendrix, Hatcher, and Shepherd). Fugate's counsel conducted a brief re-direct examination of Hatcher. The witnesses' testimony was completed by 4:12 p.m., and the jury was dismissed prior to the charge conference. After deliberating for one hour and forty-three minutes, the jury returned a recommendation of death.[5]

Fugate's conviction and sentence were affirmed on appeal, *Fugate v. State,* 263 Ga. 260, 431 S.E.2d 104 (1993), and reconsideration was denied. Fugate filed a petition for writ of habeas corpus in the Superior Court of Butts County and alleged ineffective assistance of counsel. At an evidentiary hearing, Bellury said that he was never able to find or corroborate the existence of the note from Pattie with the name and phone number of the hotel. He said that he did not consider the note or the flannel shirt significant pieces of evidence because he felt that "the evidence pretty much showed that he believed she would not be there." Bellury had interviewed Pattie's employer, David Hallman, who said that he "believed until that Friday ... that Patti would be off that weekend ... but ... that he told her that she would have to work" because another employee would not work for her. When asked, he agreed that "Mr. Hallman's testimony that she was expected to be off that weekend" would have supported Fugate's testimony that she had told him that she would be off.

Following the filing of post-hearing briefs, the state habeas court, in a ninety-two page order, denied Fugate's state habeas petition. The state habeas court noted that Fugate had raised several grounds which were procedurally defaulted, and that Fugate's claim of ineffective assistance of counsel was "not ...

---

[5]Under Georgia law, O.C.G.A. § 17-10-30(c), the jury was authorized to impose the death penalty if it found the existence of at least one statutory aggravating circumstance. Once it made such a finding, the jury had the discretion to choose between the death sentence or life imprisonment. *See Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1, 3 (1982). In Fugate's case, the jury found two statutory aggravating circumstances: (1) the offense of murder was committed during the commission of another capital felony (kidnaping with bodily injury) and (2) the offense of murder was committed during the commission of burglary. O.C.G.A. § 17-10-30(b)(2).

Fugate was sentenced to twenty years for burglary, consecutive with life for kidnaping with bodily injury, and ten years for theft by taking.

established so as to constitute cause for the procedural defaults."[6]  The state habeas court commented that

Fugate "recognize[d] that the decision of the United States Supreme [C]ourt in *Strickland v. Washington* ...

governs the usual evaluation of claims of ineffective assistance of counsel," but found that

> there were no extraordinary circumstances present in this case, such that would establish a complete
> denial of counsel or a breakdown in the adversary process eliminating an examination of prejudice
> as a requirement by this Court in considering Petitioner's claim.  Throughout the trial counsels'
> habeas corpus direct and cross-examination testimony, lead counsel was able to articulate his
> reasoning behind specific tactical decisions for his defense.

In assessing "the benchmark for judging any claim of ineffectiveness," the state habeas court stated that "the

performance inquiry must be whether counsel's assistance was reasonable considering all of the

circumstances."  The state habeas court then evaluated Fugate's ineffectiveness claims "viewed from a

perspective of counsel at that time."  The state habeas court noted that Bellury and Browne "prepared for trial

and investigated evidence to support [Fugate's] accident defense," and that "Mr. Bellury testified that he and

Mr. Browne were very clear 'from beginning to end' as to what their defense would be."  On the issue of

ineffective assistance of counsel during the guilt phase, the state habeas court held that an "exhaustive

---

[6]The state habeas court held that the issue regarding the use of an "outdated" unified appeal checklist
and an allegedly incomplete and inaccurate report of the trial judge was procedurally defaulted because it
was found to be moot by the Supreme Court of Georgia.  The state court held that it was precluded from
reviewing the following issues because they were raised on direct appeal:  (1) the admission of Fugate's
statement;  (2) change of venue;  (3) admission of testimony regarding the contents of an unauthenticated
telephone bill;  (4) admission of items without a showing as to the complete chain of custody;  (5)
prosecutor's misstatement of the law during closing arguments;  (6) prosecutor's interjection of prejudicial
matters into closing arguments;  (7) jury charge erroneously stated the burden of proof;  (8) jury charge
on the proof of kidnaping with bodily injury;  (9) prosecutor's improper and prejudicial questions to a
penalty-phase witness;  (10) the trial judge's delay in preparing the report;  (11) prosecutor's improper
penalty-phase closing argument;  and (12) disproportionate sentence.  The state court held that the
following issues were procedurally defaulted because no objection was made at trial or they were not
raised on direct appeal:  (1) the indictment was vague and overly broad;  (2) no part of the district
attorney's file was made a part of the record;  (3) suppression of evidence seized from the van;  (4) state's
disposal of crucial evidence;  (5) trial court's allowing the prosecutor to ask statutory questions and
publish the guilt and penalty-phase verdicts;  (6) the state's key witness was permitted to sit with the
prosecution;  (7) improper testimony concerning the identity of the people whose telephone numbers were
on a telephone bill and their relationships to the victim;  (8) the state's presentation of testimony by a
witness not on the witness list;  (9) testimony regarding a blood sample without a chain of custody or
identification of the evidence and unavailability of the van for defense inspection;  (10) testimony that
Fugate would kill Pattie;  (11) improper cross-examination of Fugate about facts not in evidence and
insinuation of facts not proven;  (12) improper argument without any basis in the record about a notepad
listing telephone numbers allegedly called by Fugate at the victim's residence;  (13) improper verdict form
as to the lesser-included offense of criminal trespass;  (14) improper use of the burglary conviction as an
aggravated circumstance at the penalty phase;  (15) improper instruction on burglary and criminal
trespass;  (16) trial court's failure to give an instruction on convictions for several counts based on the
same conduct;  (17) improper indication to the jury that the grand jurors' names would be on the
indictment;  (18) convictions for aggravated assault and kidnaping were predicated on the same facts and
thereby violated Fugate's constitutional rights;  (19) convictions for aggravated assault of both Pattie and
Mark Fugate were based on the same facts;  (20) denial of all defense requests to charge at the penalty
phase;  and (21) the statutory aggravating circumstances were based on the same underlying facts.

examination of the record and transcript establishes [ ] that 'petitioner's conviction resulted not from any deficiency in his legal presentation, but from the overwhelming evidence of his guilt." ' On the issue of ineffective assistance at the penalty phase, the state habeas court noted that "it has been repeatedly held that the failure to put on mitigating evidence at a sentencing hearing at all is not per se ineffective," and held that the evidence showed that "Mr. Bellury had sufficient knowledge of potential mitigating evidence to arrive at an informed judgment," and that the failure to "introduce additional mitigation evidence did not prejudice the sentencing phase."

Fugate filed an appeal and applied for a certificate of probable cause ("CPC"), but the Georgia Supreme Court denied CPC and reconsideration.[7] On December 10, 1997, Fugate filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Georgia.[8] Fugate raised three primary issues: (1) ineffective assistance of counsel in both the guilt and penalty phases of the trial; (2) improper admission of evidence; and (3) prosecutorial misconduct. After briefs were filed by the parties, the district court denied federal habeas relief. *Fugate v.. Turpin,* 8 F.Supp.2d 1383 (M.D.Ga.1998). The district court found one of the ineffective assistance of counsel claims, the improper admission of evidence claim, and the prosecutorial misconduct claim to be procedurally barred.[9] *See id.* at 1387. After agreeing with the state habeas court that *Strickland* was the proper Supreme Court precedent governing Fugate's remaining ineffective assistance of counsel claim, the district court stated, "[T]he court cannot find that the state habeas court unreasonably applied *Strickland* to the facts of this case." *Id.* at 1388. The district court continued that "the state court's well-reasoned and thorough opinion adequately analyzed all claims," and it "agree[d] with the state court's conclusions in all respects," specifically noting that "while the defense was not perfect—it

_____

[7]Fugate did not file a petition for writ of certiorari to the United States Supreme Court from the denial of his state habeas petition.

[8]Fugate simultaneously moved for leave to proceed *in forma pauperis* and for a stay of execution of his death sentence, which was scheduled for December 12, 1997. The district court granted both motions and stayed his execution "until such time as his § 2254 petition has been finally decided in this and all appellate courts to which he has the right to appeal." Fugate also was granted appointment of counsel.

[9]The district court noted that Fugate admitted that he previously had not raised the issue of whether his counsel was ineffective in failing to seek an instruction on voluntary manslaughter, found that issue unexhausted, and held that, because Fugate had failed to make a showing of cause and actual prejudice, this claim was procedurally barred. *Fugate v. Turpin,* 8 F.Supp.2d 1383, 1387 (M.D.Ga.1998). The district court also found that it was unable to review "a number of claims" which were found to be procedurally barred by the state habeas court and that Fugate had failed to show cause and actual prejudice. *Id.* These included the claims of improper admission of evidence and prosecutorial misconduct. *See id.*

never is after the fact—under the circumstances it was more than constitutionally adequate." *Id.* Fugate timely appealed and was granted a certificate of appealability.

## II. STANDARD OF REVIEW

In appeals involving claims of ineffective assistance of counsel, we traditionally review the district court's findings of fact for clear error and its legal conclusions and mixed questions of law and fact *de novo*. *See Williams v. Head,* 185 F.3d 1223, 1226-27 (11th Cir.1999), *cert. denied,* 530 U.S. 1246, 120 S.Ct. 2696, 147 L.Ed.2d 967 (2000). In this case, however, both this court and the district court are reviewing, pursuant to 28 U.S.C. § 2254, a final state habeas judgment. Section 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1218 (1996), establishes a more deferential standard of review of state habeas judgments. *See* 28 U.S.C. § 2254; *Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[10]

First, § 2254(e)(1) provides for a highly deferential standard of review for factual determinations made by a state court: "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Bottoson v. Moore,* 234 F.3d 526, 531 (11th Cir.2000).[11]

Second, § 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only where that adjudication in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by requiring satisfaction of one of two conditions for issuance of the writ. *Williams,* 529 U.S.

---

[10]Because Fugate's petition was filed in December 1997, our review, like the district court's, is governed by the AEDPA, which was effective as of April 24, 1996.

[11]Prior to the AEDPA, § 2254(d)(8) provided that factual findings of a state court were presumed to be correct unless "the Federal court on consideration of the record as a whole concludes that such factual determination is not fairly supported by the record." 28 U.S.C.A. § 2254(d)(8) (1994). Section 2254(e)(1), as enacted by the AEDPA, not only retains the presumption of correctness but also adds that the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In this case, the district court did not make any independent findings of fact but instead relied upon the factual findings of the state habeas court.

at 412, 120 S.Ct. 1495. The Supreme Court has explained the requirements in § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13, 120 S.Ct. 1495.

The "contrary to" clause in § 2254(d)(1) "suggests that the state court's decision must be substantially different" from the relevant Supreme Court precedent. *Id.* at 405, 120 S.Ct. 1495. Although a state court's decision that "applies a rule that contradicts" the governing Supreme Court law is "contrary," *id.,* a state court decision that applies "the correct legal rule" based on Supreme Court law to the facts of the petitioner's case would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law. *Id.* at 406, 120 S.Ct. 1495. In evaluating the " 'unreasonable application' inquiry," *id.* at 409, 120 S.Ct. 1495, the federal court should consider whether the state court's application of the law was "objectively unreasonable" and should not apply the subjective " 'all reasonable jurists' " standard, *id.* at 410, 120 S.Ct. 1495. The Supreme Court clarified that, under 28 U.S.C. § 2254(d)(1), the federal court may not issue the writ unless it finds that the state court applied Supreme Court law unreasonably. *Id.* at 411, 120 S.Ct. 1495.

## III. LEGAL PRINCIPLES GOVERNING COUNSEL'S PERFORMANCE

The Supreme Court has identified *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as the "controlling legal authority" to be applied to ineffective assistance of counsel claims. *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show (1) that "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 687, 688, 104 S.Ct. 2052, and (2) that "the deficient performance prejudiced the defense," *id.* at 687, 104 S.Ct. 2052. In a capital case, the two-prong *Strickland* analysis is applied at both the guilt and penalty phases. *Mincey v. Head,* 206 F.3d 1106, 1142 (11th Cir.2000) (quoting *Strickland,* 466 U.S. at 686-87, 104 S.Ct. 2052).

Counsel's performance is entitled to "highly deferential" judicial scrutiny, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v.*

*Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). This presumption is even stronger when the reviewing court is examining the performance of an experienced trial counsel. *See Chandler v. United States,* 218 F.3d 1305, 1316 (11th Cir.2000) (*en banc* ), *cert. denied,* --- U.S. ----, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001).

In this case, the state habeas court acknowledged that ineffective assistance of counsel claims are governed by *Strickland* and that the petitioner was required to show both ineffectiveness and prejudice. To analyze the prejudice prong, a court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Williams,* 529 U.S. at 397-98, 120 S.Ct. 1495 (citing *Clemons v. Mississippi,* 494 U.S. 738, 751-52, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)).

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Chandler,* 218 F.3d at 1314 (footnote and citations omitted). In order to show that counsel's performance was unreasonable, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315 (footnote and citation omitted).

"No absolute rules dictate what is reasonable performance for lawyers." *Id.* at 1317 (citing *Strickland,* 466 U.S. at 688-89, 104 S.Ct. 2052). Thus, courts refrain from establishing rigid requirements for trial counsel's performance. For example, there is no absolute duty to investigate particular facts or a certain line of defense, although a complete failure to investigate may constitute deficient performance of counsel in certain circumstances. *See id.; Housel v. Head,* 238 F.3d 1289, 1294 (11th Cir.2001) ("A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history.").

Likewise, "[n]o absolute duty exists to introduce mitigating or character evidence." *Chandler,* 218 F.3d at 1319. This court and the Supreme Court have held repeatedly that the performance of counsel who fails to present any mitigating evidence whatsoever—even when such evidence was available—may nonetheless pass constitutional muster. *See id.* (citing *Burger v. Kemp,* 483 U.S. 776, 794-96, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Darden v. Wainwright,* 477 U.S. 168, 182-84, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Waters v. Thomas,* 46 F.3d 1506, 1511 (11th Cir.1995) (*en banc* )). Indeed, "[c]onsidering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy

requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.* (citations omitted).

With these governing principles in mind, we turn to an evaluation of the performance of Fugate's attorneys during both the guilt and sentencing portions of this trial.

## IV. INEFFECTIVE ASSISTANCE AT THE GUILT PHASE

Fugate argues that his attorneys' performance was deficient and that he suffered prejudice as a result because the jury was deprived of critical evidence and exposed to improper and prejudicial evidence and assertions. Specifically, Fugate claims that the resolution of the guilt phase depended upon the resolution of a few critical facts, including Fugate's expectation that his ex-wife and son were out of town, the physical location of Fugate and Pattie when the fatal shot was fired, and the workings of the gun and likelihood that it discharged accidently. Fugate maintains that his attorneys failed to subject the state's case to adversarial testing on each of these issues.

Upon review, we conclude that the efforts of Fugate's counsel with regard to these issues did not constitute ineffective assistance.

*A.    Corroboration of Fugate's Intent*

Fugate maintains that his attorneys were ineffective in failing to offer evidence to support his assertion that he thought Pattie would be out of town over the weekend and that this information was critical to his defense. During the trial, Fugate testified that he had received a note from Pattie indicating that she would be out of town on May 4, and it provided him with the telephone number of the motel where she would be staying. He claimed that he had placed the note into the pocket of a flannel shirt that he was wearing that day. Fugate's girlfriend corroborated the existence of the note and the fact that Fugate was wearing a flannel shirt on the day of the murder. Fugate's awareness of the telephone number of the hotel was corroborated by the introduced telephone records which showed that he had called the hotel. Pattie's employer testified that, although she had mentioned taking off that Saturday, she worked until a little after 4:00 P.M. on that day. Bellury testified that he did not consider the flannel shirt or the note significant evidence because other evidence supported Fugate's belief that Pattie would not be at the house.

Because the issue of whether a killing was impulsive or premeditated can be "an important factor when the jurors consider whether to recommend the death penalty," an attorney can be ineffective for failing to raise a reasonable doubt as to the impulsiveness or premeditation of the act during opening and closing arguments. *Magill v. Dugger,* 824 F.2d 879, 889 (11th Cir.1987). Ineffectiveness, however, is not

established by the fact that other testimony might have been elicited. *See Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.1995).

Although other evidence might have been presented,[12] Fugate's attorneys elicited testimony from his girlfriend and from Pattie's employer which supported Fugate's testimony that he believed that Pattie would be out of town. Fugate's attorneys were aware of the note and made an informed, strategic decision not to pursue further evidence of the note or the flannel shirt. Additionally, as the state habeas court noted, there were inconsistencies in Fugate's testimony regarding his belief that Pattie would be out of town. Even if Fugate had believed that she was out of town, he lacked permission to be in her home and was under a restraining order to stay away from her house. Therefore, we are unable to find deficient performance or prejudice on this issue.

B.      *Failure to Impeach Critical Prosecution Witnesses*

Fugate argues that his attorneys performed below professional standards by failing to impeach Mark Fugate with the inconsistencies in his written statement to the police and in his testimony at trial. Fugate also contends that his attorneys performed deficiently by failing to impeach the medical examiner with the inconsistencies in his autopsy report and in his testimony at trial.

In his statement to the police, Mark said that he

> ran to the back of the van. I peeked around, I heard a shot. I saw my mother's head hit the ground. I could not tell if he held her head back or not. He had his back to me. He was holding her by the head of the hair.

At trial, Mark testified that he saw Fugate "grab [Pattie]—holding her by her hair, tilt[ ] her head back, put the gun in her face, and pull[ ] the trigger." On cross-examination, Mark admitted, "I did not see the bullet hit her face, because I blinked my eyes at that moment when he pulled the trigger."

At the state habeas hearing, Bellury acknowledged that, prior to the trial, he had received Mark's statement to the police but said that he was unable to interview Mark. Bellury said that after conducing their pretrial discovery, he and Browne "finally concluded that [Mark] could not see, certainly couldn't have seen everything that went on" and believed that he argued that to the jury. Bellury recollected that Mark testified

---

[12]In particular, Fugate contends that his counsel should have shown the jury a photograph, which was introduced in evidence, in which a flannel shirt is shown lying on the front passenger seat of the van.

at trial that Fugate "grabbed [Pattie's] hair but some way had held her head back and shot her."[13]

The decision as to whether to cross-examine a witness is "a tactical one well within the discretion of a defense attorney." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir.1985). Absent a showing of "a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial," the petitioner is unable to show prejudice necessary to satisfy the second prong of *Strickland. Id.* We have found ineffective assistance where counsel failed to impeach the key prosecution witness with prior inconsistent testimony where the earlier testimony was much more favorable to the

---

[13]Fugate also argues that his lawyers failed to point out that Mark may have embellished his description of the altercation between Fugate and Pattie by testifying that his father struck his mother fifty times with the butt of a gun because this testimony was not consistent with the medical examiner's autopsy report. In his statement to the police, Mark stated that Fugate "hit her in the head with the butt of the gun," continued "beating her" while dragging her into the living room, was "hitting her with the butt of the gun" while pulling her outside, and "kept beating her with the butt of the gun" while trying to get her into the van.

At trial, Mark testified that Fugate "started beating her" with "[t]he butt of his gun," and "kept beating her and beating her" while "trying to get her into the van." On recross, Bellury asked Mark "[h]ow many times do you recall him striking your mother with the gun ...?" Mark responded "Over 50" and explained that the blows were primarily to her "head and chest area."

The autopsy report indicated "evidence of blunt force injury to the forehead, back of the head, and the upper extremities with abrasion and contusion in the shoulder region," and noted findings of "2. Blunt force injuries to forehead and occipital region. 3. Bruises to upper extremities." The medical examiner, Dr. Randy Hanzlick, testified that there were "multiple bruises about the face," "a large split on the back of the head," "little bruises ... on the collarbone area," "scrapes on both knees," and "some bruises on both forearms," and he concluded that "there was evidence of some sort of a struggle with multiple injuries."

During closing arguments, Bellury asked the jurors to think about what you have been asked to believe by Mark. Now, the first thing you've been asked to believe is that in the course of scuffling from inside the house out to the door of the van, [Fugate] took the pistol—he took this very pistol right here and struck Patty fifty times—at least fifty times with this pistol, this very pistol....

Sergeant Jay Jarvis had testified. You heard him testify that this was the condition that [the gun] was in when he came to it. There is not ... a drop, not a smattering of blood, there's no indentations on here, there's no scratches....

[Y]ou're going to see the photographs ... of the blood that was upon—about the face or the head of Patty Fugate on that day. I ask you, would it be possible to have struck her that many times, that hard, severe enough to cause the bruises and he lacerations that you have—will see in the photographs ....Would it be possible for there not to have been at least a little smidgen of blood on this gun? Your common sense tells you that there would have had to have been. Your observation will tell you that there isn't.

Mark's testimony that Fugate beat Pattie "[o]ver 50" times was not inconsistent with his statement regarding the beatings or with the autopsy report. Further, Bellury argued the inconsistencies of Mark's testimony with the condition of the pistol as found by the officer. Therefore, Fugate cannot show ineffective assistance or prejudice on this issue.

defendant. *See Nixon v. Newsome,* 888 F.2d 112, 115-16 (11th Cir.1989); *Smith v. Wainwright,* 799 F.2d 1442, 1443-44 (11th Cir.1986) (per curiam). Ineffective assistance, however, will not be found merely because " 'other testimony might have been elicited from those who testified.' " *Waters,* 46 F.3d at 1514 (quoting *Foster v. Dugger,* 823 F.2d 402, 406 (11th Cir.1987)).

Fugate's attorneys arguably performed deficiently in failing to impeach Mark, the sole eyewitness, with his prior inconsistent statement to the police. Regardless of whether Fugate's attorneys should have pursued a more aggressive cross-examination of Fugate's son, however, Fugate is unable to show prejudice from his counsel's failure to impeach Mark. Counsel made a tactical decision to focus cross-examination on Mark's inability to see what actually happened at the critical moment of the shooting. Counsel was able to establish that Mark was unable to see what occurred.

Fugate also argues that his attorneys were ineffective for failing to impeach the medical examiner when he testified that the lack of powder burns on Pattie's forehead did not necessarily indicate that the barrel of the gun had been distant at the time of the shooting. In his autopsy report, Dr. Randy Hanzlick, the medical examiner, noted that "[t]here is no gunshot residue on the forehead, there is no charring of the wound, and there is no gunshot residue in the depths of the wound track.... This is a distant gunshot wound."[14] At the trial, the prosecutor asked Dr. Hanzlick whether he found "anything that would indicate or give [him] any idea of distance." Dr. Hanzlick responded:

> No, I didn't find any gun powder or gunshot residue in the wound itself or on the skin surface. So I can say that I—that I'm pretty sure that the gun was not directly on the skin. You know, it would've blown gun powder down into the wound, and that was not present here.[15]

Referencing a photograph, Dr. Hanzlick explained that "the hair is kind of pulled down over the forehead area and covering that area actually where the gunshot wound was." The prosecutor then asked "if the bullet passed through that hair, would that have affected the amount of stippling or powder residue and all on the skin?" Dr. Hanzlick answered that "[i]t could block it. Any object that was between the gun and the skin surface could block that powder from getting on the skin." Dr. Hanzlick responded "[y]es" when asked whether such a block would interfere with his estimation of the exact distance of the gun.

On cross-examination, Fugate's counsel asked Dr. Hanzlick what was "the maximum distance away

---

[14]The "distant" wound was also noted at the autopsy report "*Summary of Findings:* 1. Distant-type gunshot wound to forehead." The report states that the cause of death was "Gunshot wound to the head."

[15]Later in his testimony, Dr. Hanzlick again stated that "[t]here was no gun powder on the skin or in the deep parts of the wound track that I could see."

before you don't have the [gunshot] residue?" Dr. Hanzlik responded that

> with a .38 caliber handgun, once you're beyond about 18 inches to two feet or so, the pattern gets sparse enough that you might not see anything on the skin.... If that particular gun had discharged normally and was one foot away and it had a normal load in it that fired normally and there was nothing between the front of the gun and the skin, it probably would've left some sort of tattooing or stippling on the skin's surface.

When Fugate's counsel asked whether there would be much blood spattering as a result of the gunshot wound, Dr. Hanzlik answered that there would not be a lot and that the gun "was not in direct contact with the skin." At the habeas hearing, Bellury commented that he was "very surprised" by Dr. Hanzlick's "adversarial demeanor" at trial when he "did not want to admit that the distance had to be as great" as Bellury and Browne had heard him say during a pretrial interview.

Although Bellury did not use the autopsy report to impeach Dr. Hanzlick, he was able to get Dr. Hanzlick to state that the gun was not against Pattie's skin and was more than one foot away. Therefore, Fugate is unable to show prejudice as a result of the failure to impeach.

C.      *Failure to Demonstrate the Susceptibility of the Gun to Accidental Firing*

Fugate contends that his attorneys performed deficiently by failing to contact an independent weapons expert or the manufacturer of the gun regarding the possibility of an accidental firing. At trial, the prosecution presented testimony that the gun involved in the murder would fire in two modes: a single-action mode, which required that the gun be cocked, and a double-action mode, which did not require that the gun be cocked. In the single-action mode, it took 4.2 pounds of pressure to fire; in the double-action mode, it took more than 12 pounds of pressure to fire. During the state habeas corpus hearing, Fugate introduced the affidavit of an expert witness which indicated that the spur on the hammer of this gun is "manufactured with a grid surface to facilitate being cocked." The expert opined that, based on the grid surface, "it is easier for the 11/32" wide spur to become accidently cocked due to contact with a person's clothing, hair or body parts."

Ineffective assistance of counsel does not implicate the Sixth Amendment unless the attorney's conduct affected the reliability of the trial process. *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). A Sixth Amendment violation will be found "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," making "the adversary process itself presumptively unreliable." *Id.* at 659, 104 S.Ct. 2039. In order to prove ineffective assistance, a petitioner must show that his attorney's acts or omissions were not "the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Counsel is ineffective when he failed to investigate adequately the sole strategy

for defense and to prepare evidence to support the defense which might have affected the jury's comparison of conflicting testimony. *See Code v. Montgomery,* 799 F.2d 1481, 1483-84 (11th Cir.1986).

Counsel has a constitutional duty to investigate and prepare a defense strategy, *House v. Balkcom,* 725 F.2d 608, 618 (11th Cir.1984), and to not proceed with a "defense without evidence to support it," *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982). In order to show ineffective assistance of counsel for counsel's failure to investigate and present expert testimony at the sentencing phase, we have held that the petitioner must show:

> (a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed. Failure to meet *any* of these steps defeats the ineffectiveness claim.

*Elledge v. Dugger,* 823 F.2d 1439, 1446 n. 15 (11th Cir.) (per curiam), *withdrawn in part on other grounds,* 833 F.2d 250 (11th Cir.1987). Where counsel investigated the possibility of presenting expert testimony, but decided, based on that investigation, not to present this form of mitigating evidence, the *Elledge* test does not need to be applied. *Mincey,* 206 F.3d at 1146 n. 83.

We cannot say that, under the circumstances in this case, the decision by Bellury not to hire an expert witness to testify regarding the propensity of the gun to accidental firing was unreasonable. Fugate's defense was based on his claim that the gun accidently fired during his altercation with Pattie. Fugate never claimed that the gun was cocked when it discharged or that it cocked accidentally but claimed that he squeezed the trigger accidentally. Bellury and Browne were experienced with firearms, visited the state crime lab, examined the gun, and investigated the amount of trigger movement required to discharge the firearm. Bellury testified that he did not believe that an expert would have helped. At trial, Bellury cross-examined the state's firearm expert regarding the amount of force needed to discharge the gun. The accident defense submitted to the jury was supported by the testimony of Fugate and the state's firearm expert.

D.      *Alleged Failure of Counsel to Protect Legal Rights*

Fugate claims that his attorneys failed to object to the prosecutor's reference to Fugate's invocation of his right to counsel during interrogation, failed to object to the prosecutor's argumentative behavior during cross-examination, and argued inconsistent theories of defense in closing argument. During the trial, the prosecutor introduced a waiver signed by Fugate at the time of his interrogation. On cross-examination, Bellury asked Georgia Bureau of Investigation agent Marc Mansfield about the contents of Fugate's

statement, and Mansfield reported that Fugate "said that it was an accident." Mansfield noted that, after Fugate "made the statement to us, 'You know, she is dead, and I think I need an attorney[,]' ... the interview was terminated." During the prosecutor's cross-examination of Fugate, Fugate commented that the police had harassed him. The prosecutor replied that "the minute that you told them that you didn't want to talk to them any more, that you wanted an attorney, they shut up, and left you alone." Fugate responded, "No, sir, they did not. I told them the first thing that I went in there, that I needed an attorney."

At the habeas corpus hearing, Bellury conceded that the testimony that Fugate terminated the questioning by asserting his right to counsel did not help his case. He explained that he did not move to exclude the statement and "regarded [the statement] as neutral," because it "[b]asically" was consistent with Fugate's testimony at trial. He testified that he did not want to further address Fugate's termination of the questioning because it was "inconsistent" and did not "blend in" with the defense theory that Fugate was forthcoming.

In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that the use of a defendant's silence at the time of his arrest for impeachment purposes violates due process. *Id.* at 619, 96 S.Ct. 2240. The Court later extended this protection to post-*Miranda* invocations of the right to counsel. *Wainwright v. Greenfield,* 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). If the prosecution violated the *Greenfield* standard, then we must determine whether that "error 'had substantial and injurious effect or influence in determining the jury's verdict." ' *Hill v. Turpin,* 135 F.3d 1411, 1416 (11th Cir.1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Ineffective assistance of counsel may be established where a defense counsel fails to object to the prosecutor's "very serious instances of prosecutorial misconduct" which include "the initial introduction of [the defendant's] silence," "cross-examination of [the defendant] about his post-arrest silence," and "argument which invited the jury to consider constitutionally protected silence as evidence of [the defendant's] guilt." *Gravley v. Mills,* 87 F.3d 779, 785 (6th Cir.1996). Although repeated and intentional *Greenfield* violations are unconstitutional, references to a defendant's silence that are "isolated" or "unintentional" or "promptly addressed by a curative instruction from the trial court" and not further "highlight[ed]" by "questioning other witnesses or during closing argument" are reviewed for harmless error. *Hill,* 135 F.3d at 1417.

In this case, the *Greenfield* violations were harmless. There were two technical *Greenfield* violations when the jury heard that Fugate asked for an attorney at the end of his voluntary police interview. Fugate's

counsel failed to object to this admission, and the trial judge failed to give a curative instruction to the jury. Both improper references, however, were brief and one occurred in Fugate's testimony. The prosecutor did not repeat the references, question other witnesses regarding them, or address them during closing argument.

Fugate contends that his attorneys were ineffective by failing to object to the prosecutor's argumentative, bullying, and prejudicial cross-examination. At the habeas hearing, Bellury said that, although he was "definitely taken back" when Fugate "ask[ed] the prosecutor if he could hold the gun," he should have objected when the prosecutor "said to Mr. Fugate, 'You could sell the Golden Gate Bridge,' " and accused him of being a liar. When asked whether he agreed that it was important to object to improper questions, Bellury responded, "Well, sometimes and sometimes not. It's a decision that has to be made. It's an important decision. I would say that certainly it's that, yes." Bellury conceded that, in hindsight, he "probably ... would object." He explained:

> I deliberately did not make those objections then. I—It wasn't that I was sitting there asleep or something. Those were deliberate decisions. Right or wrong, they were deliberate decisions at the time.
>
> ...
>
> I wasn't thinking of it in terms of who was getting the best of the argument.... I was mainly thinking that this was the most dreadful sort of—sort of testimony I had ever—ever had a client give at any time and I was hoping it would be over with just as quickly as it could possibly be over with. The shorter that went on the—the better off I figured we were.
>
> ...
>
> I am saying that at the time my lack of objections were deliberate .... at the time it made sense to me to do what I did and to not do what I didn't do.

In evaluating counsel's performance, we "always avoid second guessing with the benefit of hindsight" and "allow lawyers broad discretion to represent their clients by pursing their own strategy." *White v. Singletary,* 972 F.2d 1218, 1220, 1221 (11th Cir.1992). In this case, Fugate agreed to several incriminating lines of inquiry from the prosecutor by offering to demonstrate how the gun fired, looking unsympathetically at the pictures of his deceased ex-wife, and arguing with the prosecutor over the severity and cause of his ex-wife's injuries. Bellury stated that he made a deliberate decision to expedite Fugate's testimony because it was so inherently damaging. Therefore, because Bellury's failure to object was strategic, there was no ineffective assistance of counsel.

Fugate contends that his attorneys rendered ineffective assistance by arguing inconsistent theories of the case during closing argument. He maintains that, while Bellury focused on the accident defense,

Browne advanced a self-defense theory by characterizing Pattie as a "Bengal tiger." In Georgia, the presentation of inconsistent defenses by two defense attorneys is ineffective assistance. *See Ross v. Kemp,* 260 Ga. 312, 393 S.E.2d 244, 245 (1990) (per curiam).

During closing arguments, both Bellury and Browne argued that the shooting was an accident. They had discussed their closing arguments in a "very general fashion" before the trial, and Bellury was familiar with Browne's style. Browne attempted to explain that the accident was precipitated by a scuffle prompted by Pattie's over-reaction to Fugate's presence and his stories were his means of analogizing that over-reaction. The state habeas court found that counsels' closing arguments, "while perhaps contrasting in style, was not contrasting on the critical issue of Petitioner's defense, which this was a tragic accident." Because Bellury and Browne argued consistent theories of defense, there was no ineffective assistance of counsel during closing argument.

Alternatively, even assuming *arguendo* that Fugate has shown sufficient errors by his counsel to rise to the level of constitutionally deficient performance at the guilt phase, we conclude that the substantial evidence of Fugate's guilt would defeat any showing of prejudice. The state habeas court found, and we agree, that the trial evidence would support the jury's findings that: 1) Fugate broke into the victim's house through the basement window and waited all day for her return, intending to take her away with him against her will; 2) Fugate was there at least eight hours; 3) the son's rifle had been disabled; 4) Fugate forced Pattie out to the van with a gun in his hand; 5) Pattie was beaten by a blunt object on the head and had bruises around her face, shoulders, and body that were consistent with defensive wounds; 6) Fugate first shot inside the house; 7) Fugate intentionally shot Pattie; 8) Fugate lied about his excuse for even having a gun or having taken the gun; 9) Fugate's own testimony was impeached several times before the jury by his girlfriend's testimony and by his own testimony; and 10) Fugate's demeanor before the jury on cross-examination was hostile. Therefore, Fugate's claim of ineffective assistance of counsel at the guilt phase fails under the prejudice prong.

## V. INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE

Fugate contends that his attorneys failed to obtain and present adequate mitigating evidence during the penalty phase of the trial. This failure, he claims, was a product of neglect rather than of strategy and thus rendered his counsels' assistance ineffective. He asserts that had his attorneys conducted a sufficient investigation they would have discovered important mitigation evidence concerning his military experience,

work history, lack of a criminal record, and good reputation in the community. Fugate argues that this additional mitigating evidence was especially necessary in light of the "distorted and unreliable" picture of the crime that resulted from his counsel's allegedly insufficient performance during the guilt phase of the trial.

Again, after reviewing the record in this case and in light of the applicable rules, we conclude that Fugate's claim that his counsel provided ineffective assistance during the penalty phase fails as a matter of law.

*A.     Evidence Presented During the Penalty Phase*

As mentioned above, Fugate's attorneys called four witnesses during the penalty phase. These four witnesses testified generally about Fugate's work history and character, noting that he was a hard worker and a good father and that he was helpful, non-violent, and good with children.

Hendrix testified that Fugate was "a mighty hard worker." Hendrix stated that he first met Fugate when Fugate was working on the house of Hendrix's neighbor. Hatcher and Shepherd both testified that they did not know Fugate to be violent.[16] Although on cross-examination Hatcher conceded that he had heard from his girlfriend that Fugate "harassed" his ex-wife, on re-direct Fugate's counsel elicited additional testimony from Hatcher that he had never seen Fugate commit any violent acts.[17] In addition, Shepherd testified that Fugate was "always very polite" and that he was "very good" with her children as well as Connie

---

[16]When asked about Fugate's character, Hatcher stated, "I'd say he's got a rather well character, you know." His testimony continued:

Q.     Okay. Have you ever known him to be a violent person of any sort?

A.     Not to the point where he'd strike somebody.

Q.     You've never known him to do any physical violence to anybody?

A.     No, sir.

In addition, Shepherd testified:

Q.     Have you ever known Wallace, to your knowledge, to commit any violent acts?

A.     No.

[17]Specifically, Hatcher testified on redirect:

Q.     But, you never saw—never saw him commit any violent acts toward her or anybody else, did you?

A.     No, sir, I've been there in one case where they were arguing the whereabouts of their horses. And, it was just arguing, it did not come to the point of no striking or physical violence.

Roach's, stating that the kids "really liked" Fugate.

Of the four witnesses called during the penalty phase, Fugate's mother, Mary Fugate, provided the most extensive testimony concerning Fugate's character. She testified about Fugate's childhood, stating that he was "a real good boy" and "an obedient child" who was never in trouble.[18] She stated that he had "always worked, ever since he was small."[19] When asked about whether Fugate was a good father, Fugate's mother stated, "I'd call him an excellent father." She testified that Fugate did most of the housework and that he "was

---

[18]Mary Fugate's testimony in this regard proceeded as follows:

Q.  ... [W]hat kind of boy was Wallace?

A.  He was a real good boy. He's never been in no trouble.

Q.  Was he an obedient child?

A.  Yes.

Q.  Did he attend school like he should?

A.  Yes, he did.

Q.  Did he have problems with fighting or things like that?

A.  No, never.

Q.  As a matter of fact, did you ever know him to ever have a fight?

A.  No, only with his brothers and sisters. Fussing, and going on.

[19]When Browne referenced Fugate's work history during his closing argument in the guilt phase, the prosecution objected that no evidence of Fugate's work history had been admitted into evidence at that time, an objection that was sustained without a response by Fugate's counsel. In fact, during Fugate's direct examination in the guilt phase there had been some discussion of his job:

Q.  What is your occupation?

A.  I'm self-employed. I'm a contractor.

Q.  Okay. You build houses ...

A.  Yes.

Q.  ... or renovate houses, that sort of thing?

A.  Anything to do with any type of building.

> At any rate, evidence of the fact that Fugate was a hard worker was admitted into evidence *during the penalty phase* through Hendrix's and Mary Fugate's testimony. Furthermore, as discussed *infra,* Bellury testified at the state habeas proceeding that he and Browne decided that evidence of Fugate's work history was not useful for their purposes at sentencing. Therefore, any omission of evidence of work history *at the guilt phase* is of little relevance to our analysis.

a good father because all he done was work for" his family. Fugate's mother also testified that Fugate was not violent.[20] In addition, Mary Fugate conceded that Fugate and Pattie had "some stormy times" in their marriage.[21] She admitted that upon her return after "a couple of years" from another state, there had been no appreciable change in Fugate's attitude or behavior.

Following the testimony of the four witnesses and the charge conference, both the prosecution and Fugate's counsel made closing statements. During his closing argument, Bellury emphasized that there was no record that Fugate had a conviction of any kind, stating:

> If this man had committed a violent act previous to this of any kind, if he had committed another murder or another aggravated assault, or another kidnaping, anything like it, anything involving violence, anything. You can be sure you would have that before you. Already. You would know that. You'd have evidence of it. You'd have somebody come up here and testify to it. But, you don't have that. You don't have that.
>
> There is no record—no written record, nothing shown to you of a conviction of any kind, no witnesses come in here and say, "Hey, it happened to me, but I never did bring the charge." You

---

[20]Mary Fugate's testimony in this regard proceeded as follows:

Q.  Have you ever, yourself, known him to be violent and do anything?

A.  No, sir.

Q.  Have you ever seen him commit any violent acts or anything?

A.  No, sir.

Q.  And, you didn't know of him doing anything violent, did you?

A.  No, sir.

Q.  Was he the kind of a man, in your opinion, that would commit violent acts?

A.  I know he wouldn't. He'd never do it.

Mary Fugate also stated that Fugate, to her knowledge, had never "whipped" his son.

[21]Mary Fugate testified:

Q.  Let me ask you this, your son's marriage, were you in a situation where that you could feel like you knew a good bit about what was going on in the marriage?

A.  I was up there quite a bit, yes.

Q.  And, they had some stormy times, didn't they?

A.  Yes.

Q.  Was all that Wallace's fault? Was he kicking up a lot of trouble around there?

A.  Well, a lot of it was Patty's, and some of it was his, too, probably[.]

don't have that. You don't have that. What that means is that this man is simply not a danger to his community or anybody who lives in this community or anywhere else. This happened to one that was close to him. This is not a man that goes out and robs and wants to kill folks, anybody who's going to be any danger any place.

*B.      Efforts of Fugate's Counsel in Preparation for the Penalty Phase*

*1.      Fugate's List of Potential Mitigation Witnesses*

At a pretrial hearing in January 1992, the trial judge instructed Bellury and Browne "to locate and interview all persons whose testimony might be helpful in discovering or supporting available theories of defense or in mitigation of punishment." Accordingly, Bellury requested a list from Fugate of individuals who he thought would provide testimony favorable to him if he was convicted.[22]

The list submitted by Fugate to his counsel, which was a focal point of the state habeas proceedings, was numbered one through twenty-seven, but it actually contained the names of thirty-four individuals and one business, including names of family members, neighbors, and former co-workers.[23] There is no indication as to when Fugate actually submitted this list of potential mitigation witnesses to his counsel. One of the four witnesses who testified on Fugate's behalf at the penalty phase—Elmos Hendrix—was on that list.

Referring to Fugate's list, the state habeas court found, "Each of the twenty-seven persons was contacted and decisions were made as to whether they were able to cooperate or willing to cooperate and whether they would testify and, if so, would their testimony be favorable."

*2.      Bellury's Testimony at the State Habeas Proceeding*

The state habeas court's findings were based almost entirely on Bellury's testimony at the state habeas proceeding. According to that testimony, Bellury began preparing for the penalty phase of trial as early as February 24, 1992, when he had a discussion with Browne that Bellury thought "would have dealt with

---

[22]As Bellury testified, "The best I can tell you is we had discussion about the sentencing phase, if there was to be a sentencing phase, that we would—would want to have witnesses that could help him out, and as near as I can recall I said, 'You know, you know who you know and who knew you and who you think would be favorable. Make—Make a list for me.' And that's my recollection of how it went."

[23]The names were listed on Fugate's list as follows: 1. Mr. J.D. Hallman, 2. David Hallman, 3. Grady Smith, 4. David Aldridge and Darryl Aldridge, 5. Macon Machine Inc., 6. Ron Styles, 7. John Willious, Buster Slocumb and Robert Slocumb, 8. Willis Wright and James Wright, 9. Joe Walton, 10. James White, 11. Earony Baker, 12. Charles Boyd and Joyce, 13. H.S. Pair, 14. Thurston Veal, 15. Virgil Ray Cameron, 16. Percy D. Nelson, 17. Larry R. Evans, 18. Henry Brewer and Bea Brewer, 19. James White, 20. Darrell Walker, 21. Joe Thomas and Wayne Medlin, 22. Dennis Wells, 23. Jack Deason, 24. Charles and Iona Foster, 25. Hue Paschal, 26. Grover Lavendar, and 27. Elmos Hendrix. Although James White was duplicated at numbers 10 and 19, a total of thirty-four names and one business are listed.

mitigation," among other matters.[24] Bellury spoke with Connie Jo Roach, Fugate's girlfriend, on February 27 and again on March 18.

Bellury testified that he and Browne "shared the work" on Fugate's case, "particularly on mitigation." Bellury and Browne divided the task of contacting the witnesses identified on Fugate's list between them, and together they "made an attempt, one way or another either by letter, by telephone or in person to—to contact everybody on that—on that list." R1-12-Exh. 24 at 88; *see also id.* ("In other words, I did not take all of those witnesses myself and attempt to contact them. [Browne] had attempted to contact some of them."); *id.* at 55 ("[W]e both worked on the mitigation witnesses. I did, he did. You know, even though he took some, I took some. I mean nonetheless we're both working in that same area."); *id.* at 170-71 ("We attempted to contact everyone on [the list]."); *id.* at 171 ("We did make an effort, I'm satisfied, on both—on all of 'em."). Most of Bellury's contacts of potential mitigation witnesses were by telephone. Bellury stated that when he spoke with potential witnesses he "in every instance explained why I was talking to them, why I was questioning them, what I wanted them to do and just what their thoughts were about Mr. Fugate."

While Bellury stated that he and Browne attempted to contact every witness identified by Fugate, he could not remember how many witnesses they were actually able to contact. He also could not recall specifically which witnesses on Fugate's list he contacted, nor could he ascertain from his notes which witnesses he did or did not actually contact. *See* R1-12-Exh. 24 at 170-71 ("I don't know exactly which ones I contacted and which ones Mr. Browne. That was a task that we split between us. I mean, in other words he did some, I did some."); R1-12-Exh. 25 at 265 ("I cannot say positively who I did and did not contact or—and not who—which ones I did and which ones Mr. Browne did."). Bellury did state that they "definitely contacted more people than we subpoenaed." Bellury noted that Browne would "mostly just simply tell" him about his own efforts to contact someone on the list, although he did not know which witnesses Browne may have contacted. He also stated that there were "a multiple number of people" who did not want to discuss Fugate's case, but he could not recall exactly how many.

Bellury's testimony includes descriptions of contacts with at least six potential mitigation witnesses. He specifically recalled his meeting with Elmos Hendrix, who was identified on Fugate's list and who testified during the penalty phase, and Bellury remembered "being delighted at his attitude and willingness and

---

[24]The entry on Bellury's timesheets for February 24 states, "Discussed Ms. Fugate's interview with Leo and other aspects of case." Referring to this entry at the habeas hearing, Bellury stated, "I think that would have dealt with mitigation."

enthusiasm even." Bellury also testified specifically about his pretrial discussions with Mary Fugate, Jennifer Fugate, and Connie Roach, none of whom were on Fugate's list of witnesses. In addition, Bellury stated that he "definitely recall[ed] making at least one phone call and probably more" to the Macon Machine Shop—where Fugate had once worked—although he did not recall nor did he have any record of who it was.[25] Furthermore, Bellury remembered speaking with a former neighbor who ultimately stated that he did not want to testify.[26]

Bellury knew of the broad range of evidence that could permissibly be presented at the penalty phase. In determining what testimony to present at the penalty phase, Bellury testified that he and Browne were looking for any favorable testimony, stating, "My basic, or our basic rule was, if they would come in and say anything favorable at all, then we wanted 'em to come in and say that, whatever it was. Didn't matter how minimal it might be, it didn't matter." *See also* R1-12-Exh. 24 at 91 ("I guess we just wanted to find anything that we—anything that anybody could say in any way that was favorable and I didn't care what it was.... It didn't matter. If they would say something favorable, that's—that was—that was wonderful."); *id.* ("We were desperate for somebody to say anything favorable, totally."). While Bellury did not have notes of his interviews with potential mitigation witnesses, he stated that generally the point of the interviews was limited to discovering whether the witness would say "something favorable" about Fugate.

However, Bellury later qualified this testimony, stating that he considered favorable testimony that Fugate was a good carpenter to be of little value. *See* R 1-12-Exh. 25 at 271-72; R1-12-Exh. 24 at 91 ("I did not really think that the fact that he was a good carpenter, which he clearly was, was gonna make any real

---

[25]Macon Machine, Inc. had its own entry on Fugate's list. In addition, Fugate's list identified three people—John Willis, Buster Slocumb, and Robert Slocumb—who were identified as working at the Macon Machine Shop.

[26]Although he could not remember the name of this individual, Bellury thought that he lived in Jones County near Macon. He described his contact with that individual as follows:

> [I] talked to the person, whoever he was, one time on the telephone. Said he had to think about it. I called back on at least two occasions, both times talked to his wife; and on the final occasion he was there, present in the room, according to his wife, who I was talking to, and she said he would not testify. Or at least I mean he—he didn't say that he wouldn't show up if we had a subpoena, but he—he—it was made clear to me that it was—he—he didn't want to do it, was not happy about it and did not want to talk to me about it anymore. That was what she was relaying to me.

Later in his testimony Bellury stated that he remembered speaking to someone in Jones County who he thought might have been Henry or Bea Brewer, both of whom were identified on Fugate's list of witnesses. It is unclear, however, whether these two recollections of discussions with a married couple in Jones County were the same.

difference in the outcome of the sentencing phase."). Bellury specifically stated, however, that co-worker testimony was not rejected, and while testimony concerning Fugate's carpentry skills was not deemed useful, co-worker testimony was considered useful if the co-worker had a long and recent relationship with Fugate.

Elsewhere in his testimony at the state habeas hearing, Bellury stated that if he had a witness who could provide favorable testimony concerning Fugate's employment history, such as his tenure at the Macon Machine Shop, he "would have put 'em on." Bellury testified that the fact that no such witnesses were called at trial was due to the fact that he did not know of anyone who could provide such evidence of Fugate's employment history.

Bellury and Browne deliberately decided not to present certain evidence at sentencing. First, they decided not to call certain witnesses. Bellury stated that it was decided not to call Connie Roach, Fugate's girlfriend, to testify at trial, because "there was perhaps a little bit too much involvement, or at least it would be perceived to have been too much—well, she was—she was the girlfriend and this was a recent, fairly recent divorce and, as I say, still appeared to me to be emotional involvement between Patti Fugate and Wallace Fugate. You know that—that just didn't strike me as the best thing to have at that stage of things." Also, Fugate's counsel decided not to call Jennifer Fugate, Fugate's cousin, to testify at trial because Bellury had "a negative reaction to her" during their interview. He continued, "I cannot tell you right now what that was, but I—I have that distinct feeling it was something very negative. I—I don't know what it was. The decision, in other words, was made pretty early." Bellury's notes, on which Jennifer Fugate's name is crossed out and accompanied by the notation "No good as witness," corroborate the fact that this was his assessment at the time. In addition, Bellury deliberately did not call Fugate himself during the sentencing phase because he was "none too happy with the way that testimony had gone in the guilt/innocence phase."

Second, in addition to excluding certain witnesses, Fugate's counsel decided not to address certain issues. Bellury stated that he made "a deliberate decision" not to present school records or testimony from employers because he did not think such evidence would have "anything to do with what the decision was as far as—as life or death," a decision that he characterized as a "judgment call" based on his experience.[27]

---

[27]Bellury's testimony in this regard was as follows:

Q.    On direct examination Mr. Bright asked you about whether you considered calling employers or persons of school records and that kind of stuff. Did you give any consideration to presenting that type of mitigating evidence?

A.    Well, I—I did not really. Briefly, in other words, I didn't think that would be of much value

Therefore, he decided not to visit any of Fugate's former places of employment, nor did he obtain any employment records, military records, or school records or have anyone conduct a "social history" of Fugate. Also, when asked at the state habeas hearing whether he considered evidence concerning the state of Fugate's marriage to Pattie as being "viable for the sentencing phase," Bellury stated, "We discussed that, as I recall; and my understanding was that this was a pretty stormy relationship for some period of time and I did not." This assessment is consistent with evidence presented during the guilt phase of the trial.

Bellury stated that he did not remember whether he considered calling witnesses to testify about Fugate's relationship with his son, although, as discussed above, such testimony was actually presented. He also did not recall whether he and Browne considered presenting evidence of Fugate's relationship with the children of Connie Roach, although he stated that he could not "rule out" the possibility that he did so.

3.    *Browne's Testimony at the State Habeas Hearing*

Browne's testimony concerning his preparation for the penalty phase conflicts somewhat with Bellury's account.[28] Browne stated that he did not participate in the process of contacting potential mitigation witnesses and that Bellury "talked to whatever had to be talked to."[29] When shown a copy of Fugate's list,

---

> to—to establish that he was a good carpenter, a good builder or made quality stuff. That was a deliberate decision there. Yes.

Q.    Based on your experience as a prosecutor and defense attorney, what is your view of the persuasive nature of those types of evidence, in your experience?

A.    Well, that's—that was my—my judgment call was that that—based on my experience, that wasn't gonna have anything to do with what the decision was as far as—as life or death.

[28]The state habeas court did not reference any of this testimony in its order. Rather, the state habeas court found that Browne's "memory did not allow him to recall whom he had contacted, when he contacted them, or the substance of the contact."

[29]Browne's testimony in this regard proceeded as follows:

Q.    Was there—With regard for preparing for the penalty phase of the trial, the sentencing phase, did you speak in person to anybody, any possible witness in mitigation—outside of members of his family and so forth—but did you ever talk to any friends, neighbors, employers, in person?

A.    Reg talked to whatever had to be talked to.

Q.    Did you try to contact any?

A.    No. Reg—Reg made the contacts.

Q.    Did you even try to reach anybody by telephone?

A.    I didn't—I didn't participate in that part at all.

Browne stated that he did not "remember specifically seeing this list." He further stated that he did not recall talking to any of the individuals identified on the list. When shown one copy of Fugate's list, Browne stated that none of the handwriting on it was his. In addition, Browne testified that he did not gather any school records, military records, employment records, or hospital records. Furthermore, he testified that he never visited any of Fugate's prior places of employment or spoke with Fugate's co-workers or employers, and he stated that he never spoke to any of Fugate's neighbors.

Some of Browne's testimony, however, is consistent with Bellury's account. Browne stated that he and Bellury had discussed the facts that Fugate was known to be a good carpenter and that he did not have a prior criminal history. Also, Browne's testimony that he did not participate in the process of contacting potential witnesses is somewhat inconsistent with other testimony in which he stated that generally he and Bellury prepared together for the penalty phase of the trial.[30] Browne also stated that one "could more or less say it was really we cooperated in everything." Browne stated that he and Bellury "were together practically all the time," and that they "kept close touch with each other all the time."

Other testimony from Browne suggests that he generally occupied a subordinate role in the pretrial preparation. Indeed, Bellury was appointed to be Fugate's counsel before Browne was: Bellury testified that the judge who presided over Fugate's trial instructed Bellury that he could have a co-counsel of his choice,

---

Q. You didn't participate at all?

A. He told me what he was gonna do and I was supposed to do.

Q. And would it be fair to say, then, that with regard to preparation for the penalty phase that he pretty much, Mr. Bellury that is, took care of that?

A. That's right. He—He—But he would keep me advised of what he was doing.

Q. He'd tell you what he was doing, but he was pretty much in charge of doing that?

A. Right. Yeah.

[30]Browne's exact testimony was as follows:

Q. What, if any, responsibility did you have, Mr. Browne, with regard to investigation for the penalty part of the trial, the sentencing part of the trial?

A. Well, again, it was just the same as it had been at the guilt phase of the trial. We just kind of ...

Q. Did it together?

A. Yeah.

and Bellury selected Browne.[31]  Browne testified that he was "appointed back up ... to assist Mr. Bellury, lead counsel in this case," that Bellury remained lead counsel on the case after Browne's appointment, that Bellury spent "a good deal more time" on Fugate's case than did Browne, and that he was not in charge of any part of Fugate's case.  Browne also stated that he did not keep his own file regarding his representation of Fugate, but rather, all of his materials were consolidated in one file with Bellury's materials. Bellury, however, did testify that he "did not direct Mr. Browne in any fashion" regarding Browne's attempts to contact potential witnesses.

Also, despite Browne's testimony that he did not contact any witnesses, Bellury testified that some of the handwriting on one of the copies of Fugate's list was Browne's.  According to Bellury's testimony, he and Browne had their own copies of Fugate's list.[32]  Furthermore, Browne testified that a document containing notes of a conversation with Pattie Fugate's employer, David Hallman, was in his handwriting.

4.      *Documentary Evidence of Preparation for the Penalty Phase*

Despite Browne's statements, much of Bellury's testimony is corroborated by documentary evidence presented at the state habeas proceeding.  The first express reference to "mitigation" on Bellury's timesheets occurs on April 4, 1992.  That timesheet entry indicates that Bellury's activities on that date included making telephone calls and writing letters to mitigation witnesses and making a trip to the library to research

_____

[31]Browne testified that he was appointed to assist Bellury after the initial co-counsel, Martin Fierman, removed himself from the case.

[32]Bellury testified that the copy of Fugate's list marked as Respondent's Exhibit 4 was the copy from which he worked, while the copy of the list contained among the documents marked as Petitioner's Exhibit 10, which Bellury stated contained Browne's handwriting, was the copy from which Browne worked.  That testimony proceeded as follows:

Q.      Let me show you what's been marked as Exhibit No. 4 and introduced as Exhibit No. 4. Now, is at least part of that also a part of Petitioner's No. 10?

A.      Part of it is, yes.

Q.      And can you tell what the difference is?  Some more writing on one than the other?

A.      That's correct.  And I believe that the writing on the page that's in Exhibit No. 10, the handwriting that is in blue, is Mr. Browne's.  So this—this was undoubtedly the copy that he was working from at the same time I was working from the copy that is marked State's Exhibit No. 4.

Q.      All right.  So that's what I was just gonna ask you.  So the copy of that exhibit that appears as State's Exhibit No. 4 and the writing on that, other than Mr. Fugate's writing, is yours;  and the copy of that same exhibit that appears in Petitioner's Exhibit No. 10 is the copy that Mr. Browne worked from?

A.      That appears to be the case.  Right.

witnesses' addresses and phone numbers. *See also* R1-12-Exh. 24 at 85 (Bellury's testimony regarding the April 4 entry on his timesheets, confirming that he went to the library on that day to obtain some addresses and phone numbers). Also included in that entry are telephone calls to persons who might be able to provide such contact information.[33]

On April 6, 1992, Bellury sent a form letter to four individuals on Fugate's list of witnesses (Elmos Hendrix, Grover Lavender, Larry Evans, and James White).[34] The letter stated that Fugate was on trial for murder, that the prosecution was seeking the death penalty, and that therefore he intended to call as witnesses people who knew Fugate. The letter also stated, "Please contact me as soon as possible so that I may discuss this with you. Time is of the essence."

Bellury's notes indicate that he visited with Mary Fugate and Jennifer Fugate at their home on April 5. On April 7, Bellury received telephone calls from two potential mitigation witnesses.[35] Bellury also called or attempted to call mitigation witnesses on April 23, April 24, April 25, and April 27. On April 24 and 26, Bellury spoke to Roach specifically about the topic of mitigation witnesses.

Evidence from the state habeas hearing indicates that Bellury and Browne collectively attempted to contact at least eighteen people. Bellury's notes alone reflect attempts to contact a total of at least sixteen potential witnesses.[36] Many of these individuals were not identified on Fugate's original list, and thus they

---

[33]The full entry for April 4, 1992, to which Bellury assigned 7.9 hours, reads as follows: "TC to Mary Fugate. TC's to mitigation witnesses and letters to mitigation witnesses. Trip to library to research witnesses addresses and phone numbers. TC's to persons who might give info on addresses and phone numbers."

[34]Although the salutation on each of these four letters was "Mr. White," each of the letters was addressed to a separate recipient.

[35]The entry on Bellury's timesheet stated that the "potential mitigation witnesses" were "Alexander" and "Hendrix." However, there is no witness named Alexander on Fugate's list.

[36]Notations on Bellury's work papers indicate attempts, with varying degrees of success, to contact the following sixteen people: Charles Boyd ("Left message 4-4-92. Tried again 4-7-92. Will do it. Will speak to another friend. *BUT* intends to speak to Mark first"; "left message"); William Gordon Butts and Frances Butts ("452-8571 about 7 p.m. Usually somebody there. No good"); Virgil Ray Cameron ("TC 4-4-92. Won't discuss it"); Jack Deason, Jr. ("Call Friday afternoon. Left message w/ wife. Talk to him 4-4-92. May do it. Asked me to call back during week of 4-6-92, at 743-7386 WRONG # between 8 a.m.-5 p.m. Agrees 'Buck' okay guy"); Larry Evans ("LTR 4-6-92. Left message 4-4-92"); Jennifer Fugate ("No good as witness"); Mary Fugate ("Mother, will testify"); William Hatcher, Jr. ("Mother to have contact"); Elmous and Carolyn Hendricks ("LTR 4-6-92. Knew Wallace for year. 'Nice fellow.' W is retired, nearly blind. Straightforward and willing. Believes D may have been provoked. 'been there' "); Mrs. Grover Lavender ("LTR 4-6-92. Possible. Call after 4-9-92"; "(unpublish phone # ) write + she will call"; "Call back after Thursday"); Ron Steill ("possible"; "get home # thru information. Disconnected. No listing"); Joe Walton ("[Call 4:30-5 p.m.] Left message 24

could only have been obtained through additional investigation.[37]  Two of those individuals expressly stated that they did not want to testify.[38]  Bellury's notes from his interview with Fugate's mother suggest that two other witnesses on Fugate's list also were not willing to testify.[39]

In addition, although Bellury's notes do not reflect any specific discussions with Deborah Shepherd, the fact that she testified during the penalty phase must mean that she was actually contacted at some point prior to trial.  Also, Bellury testified that he spoke with Connie Roach but ultimately decided not to use her as a witness. This evidence indicates that Fugate's counsel were successful in contacting at least ten people in preparing for the penalty phase.

C.      *Affidavits Submitted By Potential Mitigation Witnesses*

In support of his claim that his counsel could have obtained additional mitigation evidence that they should have presented during the penalty phase, Fugate introduced at the state habeas proceeding affidavits from fifteen potential character witnesses who had specific knowledge and examples of Fugate's good character traits.  Thirteen of these individuals indicated that they were available to testify at trial and would have done so if asked.[40]

Seven of the individuals who submitted affidavits—five of whom stated that they were willing to

---

April 92.  Won't do it");  Dennis Wells ("TC 4-4-92 + 4-7-92");  James White ("? May have moved to lake LTR 4-6-92";  "Disconnected").

[37]In addition to the thirty-four names included on Fugate's list, Bellury's notes identify the following twenty people:  Alan Bonner;  Gordon and Frances Butts;  Donald Cooper;  Rick Dodd;  Jennifer Fugate;  Mary Fugate;  William Hatcher, Jr.;  Carolyn Hendricks;  Thomas and Michelle Hendricks;  Fred Herring;  Rhonda Lowery;  Connie Jo Roach;  Hubert Ross;  J.B. Sbirey;  Joannah Sellers;  Deborah Shepherd;  Linda Walton;  and Sean Whatley.  While the notes do not indicate whether these witnesses were identified for purposes of mitigation or for the guilt phase of the trial, one of the lists contained among Bellury's notes is entitled "Mitigation Witnesses."

[38]Virgil Ray Cameron ("TC 4-4-92.  Won't discuss it");  Joe Walton ("[Call 4:30—5 p.m.] Left message 24 April 92.  Won't do it").

[39]"Mr. J.D. Holloman & son David Holloman—Building supply located on Collier Harmony Rd.  Doesn't want to talk about it.  Just like a daddy to Wallace."

[40]*See* Affidavits of Bea Brewer, Milton Al Brown, Jack Deason, Charles Dekle, Jeffrey Henderson, Christine Mimbs, Connie Jo Roach, Anne Smith, Grady Smith, Thurston Veal, John Willis, Kevin Woodall, Wynndale Woodall.  Jack Deason was on Fugate's list and was interviewed by Fugate's lawyers.  He indicated that he was available to testify on Fugate's behalf. but said that "the lawyer never got back to me."  Connie Roach stated that she testified during the guilt phase of trial but would have been available at any other time.

testify—were on Fugate's original list that he submitted to his counsel.[41] Bellury testified at the state habeas hearing that Fugate did not provide any additional names of potential witnesses other than those identified on the list. Therefore, Fugate's counsel could only have discovered the identities of the remaining eight affiants through additional investigation.

All of the affiants stated that, if contacted, they would have testified about Fugate's good character traits, which included being a hard worker,[42] even-tempered,[43] helpful,[44] a loving husband and father,[45]

---

[41]*See* Affidavits of Darryl Aldridge, David Aldridge, Bea Brewer, Jack Deason, Grady Smith, Thurston Veal, John Willis. Bea Brewer does not appear to have been included on the list originally. Rather, the list includes Henry Brewer, and on one copy of the list—the copy from which Bellury stated that he worked—Bea Brewer is written nearby in different handwriting.

[42]Darryl Aldridge, one of Fugate's former employers, testified that Fugate was "an extremely hard worker" who "always came to work early, and he always left late" and was "very good at carpentry," "could do anything with his hands," "knew how to do all the other work, like the electricity" and "did things beyond the demands of his job and suggested projects and work.... He worked hard, and he was very proud of his work." David Aldridge, another former Fugate employer, testified that Fugate was "a hard worker. His work was always complete. Mr. Fugate was a detail man.... very serious about the work we gave him[,] ... always at work early, and he always left late. He was a good worker for me ... liked to use his hands, and he was very good with tools.... [He] was ambitious about pursing jobs." Bea Brewer testified that Fugate was "a good worker, and could build anything." Milton Al Brown, Fugate's employer for ten to fourteen years, testified that Fugate was "a great worker and a good mechanic. He was always on the ball and always on the job ... [and] did a good job" overhauling Brown's boat engine. Jack Deason, a former neighbor, testified that Fugate was "a very good worker. He could fix all kinds of things, such as washing machines, dryers, air conditioners, and automobiles." Charles Dekle, a former Fugate co-worker, testified that "Fugate was a first class mechanic. He would put in extra effort beyond what was required or expected to do a good job. He took pride in his work." Jeffrey Henderson, another former co-worker, testified that he worked with Fugate for "four or five years during the 1970s" and that Fugate "was a good and reliable worker." Anne Smith testified that "Fugate was a very good carpenter" who had worked on her home. Grady Smith testified that Fugate was "as hard a worker as I have ever seen.... [A] very good carpenter [who built] at least three log homes.... [H]e was a very useful and productive citizen during most of his life." Fugate's neighbor, Thurston Veal, testified that "Fugate was very good with his hands. I hired him to help put a new roof on my house at the lake. He did an excellent job." Connie Roach testified that "Fugate was a very hard and very skilled worker, and he was well known in the community for being this way." John Willis, one of Fugate's former co-workers, testified that Fugate "was a real good worker. He was a smart guy and a good mechanic ... [and] did good carpentry work."

[43]David Aldridge testified that he "saw Mr. Fugate get mad sometimes but never lose his temper." Milton Al Brown testified that, while Fugate worked for him, "[n]o one ever reported any problems or ill-will" and that Fugate "got along well with his co-workers." Jack Deason testified that he "never saw [Fugate] lose his temper." Jeffrey Henderson testified that "Fugate was a likeable person here at work. He was nice and easy-going. We got along fine. As far as I knew, he got along fine with other people working there too." Anne Smith testified that Fugate "was a good person and a good friend to both me and my husband." Grady Smith testified that Fugate "was always friendly, cooperative." Fugate's former neighbor Christine Mimbs testified that "[h]urting someone was very uncharacteristic of Mr. Fugate.... I do not believe he is a danger to society." Connie Roach testified:

> The only time I ever saw [Fugate] get angry or frustrated with my children was one time when he was helping my daughter ... with her homework. [The daughter] could not understand what [Fugate] was trying to teach her and wasn't making a real effort to

understand it. [Fugate] got frustrated and a little impatient, but he finally just walked away until he cooled off.

[44]Bea Brewer testified that Fugate came over to check on her and her husband, "d[id] whatever" he could for them because they both suffered from poor health, plowed her garden and drove her home from her husband's funeral. Milton Al Brown testified that Fugate "was someone who would not refuse a friend help. I knew I could count on him. I could call him any time day or night and he would be there fast to help me." Jack Deason testified that he met Fugate "when he came by to offer to help me move in to my house on New Year's Day in 1972." Charles Dekle testified that Fugate had "helped [him] by overhauling the engine of [his] 1970 Ford. He did a good job with it." Anne Smith testified that Fugate "was the kind of person who would do anything for you. He once plowed my whole garden for me" after he had borrowed the plow and replaced some broken parts. He stated further:

> Fugate did things for us sometimes that he would refuse to take money for. He put down a rug in our old office.... At our old log house, Mr. Fugate put in a new kitchen floor for me. He sanded the floor and did the job right. I called Mr. Fugate to ask for help on Sunday, and he did the floor the next day. When I tried to pay him for these jobs, he would not take any money.

Grady Smith testified that "Fugate was the type of person who would do anything for someone.... Fugate once borrowed my tiller once to dig up his garden" and replaced the worn blades. Smith said that he tried to pay Fugate for the blades, "but he would not accept any money." Smith related that, "[o]n another occasion," "Fugate ... agreed to [lay a vinyl floor in his house] and came to do the work the same day.... These experiences were typical of my experiences with Wallace Fugate. He was always ... willing to lend a hand." Thurston Veal testified that Fugate "would help me on all kinds of projects on my property" and "never charged me any money.... Fugate used to do things for me and refused to take any money for it. I asked him to put up a storm door for me once," which he did "right away. When I tried to give him money for putting up the door he wouldn't take any." John Willis testified that Fugate

> would help out anybody who needed help. He was just that kind of person. I once bought an old motorcycle and he fixed it up for me. [Fugate] also helped me work put motors into a couple cars I had owned. He did not charge me anything. If there was any way he could help you, he would.

Wynndale Woodall testified that

> 4. Mr. Fugate was the type of person who would always help you out if he could. He would do anything for you. I built a shop in the back of my house once.... Mr. Fugate saw that I was mixing the concrete by hand, and came over to offer help. He lent me the machinery to do the job. I didn't give Mr. Fugate any money for the equipment. He was just being neighborly. Once when I was building a well, Mr. Fugate showed me how to do the electrical work on it, so I wouldn't be hurt.

> 5. Mr. Fugate looked out for me even when he wasn't at home. I broke down once on my motorcycle.... Mr. Fugate saw me on the road and came to pick me up.... loaded the motorcycle onto his truck, and Mr. Fugate took me home....

[45]David Aldridge testified that, in 1987-1988, Fugate and Pattie "seemed to get along fine." Milton Al Brown testified that Fugate brought Pattie and Mark to Brown's house so that Pattie could ride Brown's horses and that Fugate cared for Mark while Pattie rode. Brown said that Fugate "really loved that boy. He was affectionate with him and was always looking after him while his mama rode horses. He loved his wife too. He would stop work just to bring her up to my house to ride." Jack Deason testified that he had known Pattie for many years and that "[s]o far as I knew, Mr. Fugate treated Pattie very well during their marriage. I always thought of them as being very close.... [t]hey worked closely together in raising money for the volunteer fire department." *See also* R1-12-Ex. 29, Pet. Exh. 31 at 2 ("During the

generous,[46] honest,[47] and good with children.[48]  Two of the affiants averred as to changes in Fugate's

---

time I knew Wallace and Patty Fugate as a neighbors, they got along fine.")  Christine Mimbs testified that, while she and Fugate were neighbors, "Fugate loved his son Mark very much.  He used to do all kinds of things for him," including teaching him to swim, buying him a pool, building him a doonbuggy, and showing him how to "use the tools to pitch the [camping] tent and set up the campsite."  Mimbs said that "Fugate and Mark used to work on projects together in their yard," such as a pontoon boat.  She noted that "Fugate loved his wife Patti" and "did [things] for her that made her happy."  Mimbs testified that Fugate "spent a lot of time with his family" and that "Fugate and Patti worked ... and play[ed] together."  Connie Roach testified that

> 11. [Fugate] was very interested in and cared a lot about his son, Mark. Their relationship appeared good and close to me, although it was later strained by the tensions between [Fugate] and Pat[tie] that came from the divorce.  But [Fugate] still cared about Mark and worried about Mark's behavior and how he was doing in school.

John Willis testified that, during his visits with Fugate, he would

> see [Fugate] interacting with his wife and little boy.  It seemed like [Fugate] really cared about both of them a lot.  Whenever I saw [Fugate] and his wife together they seemed to get along well.  They were always talking, laughing and having fun.  She had some horses and I remember [Fugate] helping her take care of them.

> 6. [Fugate] used to sometimes bring his little boy to work with him.  I remember he would sometimes leave work to pick the boy up from day care or something like that.  He seemed to really love the boy.  Seemed to me that the boy really liked his daddy too.

Kevin Woodall testified that he met Fugate

> two or three years before he was arrested.  I began to see Mr. Fugate and his son Mark when they spent time at Mr. Fugate's father's house, which was next door to mine.

> ...

> 3....Mark always talked about his dad when he came over to our house.  Mark was extremely proud of his father.  Mark always bragged about his father.  He talked about all the things that he did with his dad.  Mark used to talk about how he and his father woodworked together, and went camping together.  I used to always see Mr. Fugate and Mark tinkering in the yard together.

> ...

> 4. Mr. Fugate loved his wife and his son very much.  He was very family-oriented....  [He] was building a house for his wife.... [and] bought a four-wheeler for his son.

Wynndale Woodall testified that

> 6. Mr. Fugate cared a lot about his family.  I used to see Mr. Fugate and his wife Patti together ..., [and they] were very affectionate and playful with each other.  I thought that they were in love.  I used to see Mr. Fugate in his father's yard with his father and his son Mark, working on all kinds of projects.  Mr. Fugate loved his father and he tried to take care of him.

[46]Darryl Aldridge testified that Fugate "carved a plaque for [Darryl's brother] David" as a housewarming gift.  Jack Deason testified

disposition following his separation from Pattie.[49]

---

5. Mr. Fugate was very generous to me and my family. He would help me fix my automobiles and other things whenever I asked him to. He never charged me anything for his help. He also would give me vegetables from his garden.

....

7. Mr. Fugate would fix things or do things for us without asking us for anything. For example, he once noticed ... that we were having problems with flat tires. He just showed up one day with a pressure tank that he had made for us and ... left it with me. He would not let me pay him anything for it.

Wynndale Woodall testified that

3. Wallace Fugate was the type of person who would give you the shirt off his back. He used to always come by to say hello and to see how I was doing. He would always come over and greet me. When I was going through a bad time, Mr. Fugate was concerned about me.... Mr. Fugate asked me if I needed anything or needed any help. He said that if I did need him, he would be there for me.

[47]Thurston Veal testified that "Fugate was an honest person. On one occasion, I lent him $8,000, which he needed to build a house. He paid me back every penny."

[48]Connie Roach, Fugate's girlfriend, testified that

[t]he main thing that stands out in my memories of Wallace Fugate as how good he was to my two daughters. He visited our house often and lived with for a period of time before his arrest. The four of us ... often did things together.

7.... On many evenings at our home, [Fugate] would visit and we would play cards together until it was time for [the girls] to go to bed. He would help the girls with their homework. He would insist that they get it done before allowing them to watch TV.

8. [Fugate] also used to spend a lot of time playing with [the girls] in the yard. We were always very active when we were together.... Many times the four of us went either to Pat[tie] and Steve McBee's house or to [Fugate's] parents' house to visit and to play. We would play in the creek or pick strawberries together.

9. [Fugate] was a father to my children. They loved him very much, and they still love him now. My ex-husband ... never had a problem with my seeing [Fugate] because [he] was so good to [the girls], much better than [my ex-husband] was with the children.

[49]Kevin Woodall and Wynndale Woodall averred that, following Fugate's separation from Pattie, his disposition changed. Kevin Woodall testified that

5. When Mr. Fugate separated from his wife, he seemed to be a different person. When I saw Mr. Fugate at his father's house after the separation, he was always depressed. Mr. Fugate didn't talk about his family anymore. Mr. Fugate didn't come and speak to me like he used to. I worried that he was suicidal. Mr. Fugate behaved the same way that I did when I lost my wife. He stopped caring about himself. Every time I saw Mr. Fugate after he and his wife separated, he was out of it.

Wynndale Woodall testified that

*D.*        *Evaluation of the Performance of Fugate's Counsel at the Penalty Phase*

In light of the above, we conclude that the result reached by the state habeas court constituted neither "a decision that was contrary to, or involved an unreasonable application of, clearly established federal law" nor "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Thus, we agree with both the state habeas court and the district court that the performance of Fugate's counsel at the penalty phase did not fall below constitutional standards.

In its ninety-two page order, the state habeas court made a series of factual findings on which it based its ultimate conclusion that Fugate's attorneys had rendered effective assistance during the penalty phase. In sum, the state habeas court found that Bellury and Browne

> were aware of the available evidence and made a strategic decision as to whether such testimony would be viable mitigating evidence. Each of the twenty-seven persons was contacted and decisions were made as to whether they were able to cooperate or willing to cooperate and whether they would testify and, if so, would their testimony be favorable.[50]

More specifically, regarding Bellury and Browne's contacts of potential mitigation witnesses, the state habeas court determined: that Bellury and Browne attempted to contact all of the witnesses on Fugate's list, that Bellury and Browne divided the task of contacting potential mitigation witnesses between them, that Browne's "memory did not allow him to recall whom he had contacted, when he contacted them, or the substance of his contact," that Bellury was unable to recall which individuals he was actually successful in contacting, that Bellury and Browne contacted more people than they subpoenaed, that Bellury contacted witnesses by letter and by telephone, that Bellury did not think it necessary to take notes concerning all of his contacts with potential witnesses, and that some potential witnesses to whom Bellury spoke did not want to testify.

The state habeas court also made numerous findings concerning Bellury and Browne's strategic decisions of what evidence to present at the penalty phase, including determinations: that Bellury made a "judgment call" not to present evidence concerning Fugate's employment, carpentry skills, school records,

---

> 7. Mr. Fugate was a different person after he separated from his wife. He shut himself off from everyone and he didn't want to talk anymore. All of a sudden, Mr. Fugate acted like he didn't know anyone. He was extremely depressed. For the last two or three weeks before Mrs. Fugate was killed, Mr. Fugate was especially out of it. He wouldn't speak to anyone. I worried that Mr. Fugate might hurt himself.

[50]The state habeas court's mention of "the twenty-seven people" must refer to the fact that Fugate listed his potential mitigation witnesses one through twenty-seven, even though, as previously discussed, there were actually thirty-four individuals named on that list.

or social history because he did not consider such evidence relevant to the jury's decision of whether to impose the death penalty, that Bellury and Browne discussed but rejected the idea of presenting testimony concerning Fugate's marriage to Pattie because that relationship had been "stormy," that Bellury "had sufficient knowledge of potential mitigating evidence to arrive at an informed judgment" concerning whether to present certain mitigating evidence, that Bellury and Browne "made a conscious decision to present certain mitigating evidence, and chose not to present the testimony of persons whose knowledge of [Fugate] was remote in time to the crimes," and that at sentencing, Bellury and Browne's "strategy was to present anything favorable that would serve as mitigation" on Fugate's behalf. In addition, the state habeas court concluded that the affidavits submitted by Fugate "present[ed] no compelling mitigating evidence."

Our review of the record in this case warrants the conclusion that Fugate has not rebutted any of these factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Bottoson v. Moore,* 234 F.3d 526, 531 (11th Cir.2000). In concluding that Bellury and Browne attempted to contact all of the witnesses on Fugate's list, the state habeas court apparently discounted Browne's testimony that he did not contact any potential mitigation witnesses and that Bellury "talked to whatever had to be talked to." Instead, the state habeas court, which heard this testimony, found that Browne's "memory did not allow him to recall whom he had contacted, when he contacted them, or the substance of his contact." This assessment of Browne's testimony was not improper—indeed, the state habeas hearing occurred in January 1996, over three-and-a-half years after Fugate's murder trial in April 1992.

Even if we credit Browne's testimony in full, however, Bellury's testimony and the documentary evidence that corroborates it still support the conclusion that the efforts of Fugate's counsel in preparing for the penalty phase did not constitute ineffective assistance.[51] As discussed in detail above, that evidence indicates that Fugate's counsel began preparing for the penalty phase of trial as early as two months before the trial began and no later than three weeks prior to trial. That evidence also indicates that prior to the commencement of trial Fugate's counsel attempted to contact at least eighteen potential mitigation witnesses. These eighteen individuals were identified as potential witnesses through a combination of Fugate's list and

---

[51]Fugate argues that the inconsistencies in Bellury's and Browne's testimony evidence a misunderstanding that supports the conclusion that there was ineffective assistance in this case. Even if it were concluded that Browne misunderstood his role in the process of contacting witnesses, Bellury nonetheless attempted to contact at least eighteen witnesses and actually contacted at least ten. Therefore, this case is not one in which both attorneys abdicated their respective responsibilities due to a misguided notion that the other was taking the initiative with regard to accumulating mitigation evidence. *See Jackson v. Herring,* 42 F.3d 1350, 1364 (11th Cir.1995).

independent investigation by Fugate's counsel, investigation that produced a total of twenty additional names. The record further reveals that Bellury and Browne were actually successful in contacting at least ten witnesses. Of these ten potential witnesses, two refused to testify and two more were deliberately not called to testify. Four of the remaining individuals, three of whom were identified by Fugate's counsel through their own independent investigation, were called to testify at the penalty phase.

It must be noted that these numbers represent conservative estimates. Bellury testified that his notes are not conclusive concerning the extent to which he and Browne attempted to contact potential witnesses.[52] In light of even these conservative assessments, the fact that there is no explicit proof of Bellury's and Browne's attempts to contact some additional number of potential witnesses identified on Fugate's list does not render their counsel ineffective. Indeed, while Fugate's list of potential mitigation witnesses is important to our ineffective-assistance analysis,[53] the performance of Fugate's counsel cannot be measured simply by the proportion of individuals identified on the list who they attempted to contact. Rather, our "proper inquiry is limited to whether this course of action might have been a reasonable one." *Chandler,* 218 F.3d at 1319. The record evidence indicates that it was.

The affidavit testimony submitted by Fugate does not rebut the presumption of reasonableness from which our case law requires us to begin our analysis. As a preliminary matter, we note our previous observation that reliance on such affidavits "usually proves little of significance." *Waters v. Thomas,* 46 F.3d

---

[52]Bellury testified that Respondent's Exhibit 4 (a copy of Fugate's list) and Petitioner's Exhibit 10 (Bellury's notes) constituted his entire work product regarding the mitigation case. He stated that he was generally "not much of a note taker." With regard to his preparation for Fugate's trial, Bellury stated, "I didn't concern myself a whole lot with notes as they were—if they were gonna—were willing to come, were willing to say something favorable, then that's as much as I felt like I needed to know. We'd subpoena 'em and get 'em there." He continued, "Contrariwise, if they said they—they didn't want to or had something unfavorable to say then that was, you know, no need making all that—we just scratched 'em off mentally and that was that." Bellury thus agreed that there could be interviews with potential witnesses that would not be memorialized in paper. Likewise, he stated that although he generally kept correspondence files, he "would not swear that I've got everything even there."

Furthermore, the notations contained on those documents do not necessarily reflect all of Bellury's efforts to contact those witnesses. For example, Bellury stated that his notation "disconnected" near James White's name did not "necessarily mean that we didn't get him some other way." Also, Bellury noted that he had written "left message" near Charles Boyd's name, but he could not testify about what the message he left was or whether he eventually did speak with Boyd.

[53]This court has noted, "Because the reasonableness of counsel's acts (including what investigations are reasonable) depends 'critically' upon 'information supplied by the [petitioner]' or 'the [petitioner]'s own statements or actions,' evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Chandler,* 218 F.3d at 1318 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

1506, 1514 (11th Cir.1995).[54] At any rate, even when such affidavits are considered, we have held that counsel does "not act unreasonably in failing to call other witnesses whose testimony was proffered by affidavit in the district court" when those "additional witnesses would have testified to essentially the same impressions and sentiments" related by the witnesses at trial and thus "would have added little to the weight of the mitigating evidence." *Devier v. Zant,* 3 F.3d 1445, 1452 (11th Cir.1993).

We agree with the state habeas court that the affidavit testimony on which Fugate relies primarily repeats the evidence that actually was presented at the penalty phase. As discussed in detail above, the trial testimony described Fugate as a hard worker and a good father who was generous, non-violent, and kind to children. This is precisely the same portrait that emerges from the affidavit testimony. Thus, nothing in the affidavit testimony suggests that Fugate's counsel violated the "major requirement of the penalty phase of a trial" that "the sentence be individualized by focusing on the particularized characteristics of the individual." *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987) (citing *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

Perhaps the only issues addressed in the affidavit testimony that were not presented at trial concern Fugate's carpentry skills and his disposition following his divorce from Pattie. Browne and Bellury deliberately decided, however, not to present evidence on either of these issues. As noted above, Bellury testified that he "did not really think that the fact that he was a good carpenter, which he clearly was, was gonna make any real difference in the outcome of the sentencing phase." Similarly, Bellury testified that he did not consider evidence concerning Fugate's marriage to Pattie to be "viable for the sentencing phase," since

---

[54]In *Waters,* we observed the following regarding such reliance on affidavits:

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. This case is no exception in that respect, either. That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, "[i]n retrospect, one may always identify shortcomings," but perfection is not the standard of effective assistance.

*Waters v. Thomas,* 46 F.3d 1506, 1513-14 (11th Cir.1995) (quoting *Cape v. Francis,* 741 F.2d 1287, 1302 (11th Cir.1984)).

he understood that the marriage "was a pretty stormy relationship for some period of time." We are prohibited from second guessing such tactical decisions through the prism of hindsight. *See, e.g., White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir.1992). Indeed, "[a]n attorney is not obligated to present mitigation evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good." *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.1989).

The affidavit testimony, then, proves only that some individuals identified by Fugate as potential mitigating witnesses and other individuals who were never identified as such were not contacted before the penalty phase of Fugate's trial. Whether presenting this additional testimony would have produced some additional advantage is immaterial to our analysis; rather, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' " *Chandler,* 218 F.3d at 1313 (quoting *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)) (footnote omitted). The many individuals who Fugate's counsel attempted to contact and actually contacted, and the testimony of those who testified at the penalty phase, compel the conclusion that the efforts of Fugate's attorneys were entirely reasonable. Therefore, the affidavit testimony is not sufficient to refute the state habeas court's conclusion that Fugate received effective assistance of counsel.

Simply put, the sum total of the efforts of Fugate's counsel does not fall to that level of assistance that the Supreme Court has identified as being ineffective by constitutional standards. For example, although Fugate's argument that Fugate's attorneys were ineffective is based in part on the Supreme Court's decision in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the circumstances of that case do not even resemble those presented here. In *Williams,* the defendant had confessed to four crimes—including the murder for which he was tried—while incarcerated for another offense. *See id.* at 367-68, 120 S.Ct. 1495. In the sentencing phase of the trial, the defendant's counsel presented testimony from the defendant's mother and two neighbors and played a taped excerpt from a statement by a psychiatrist. *See id.* at 369, 120 S.Ct. 1495. As described by the Supreme Court, the three witnesses "briefly described [the defendant] as a 'nice boy' and not a violent person." *Id.* In his closing argument, the defendant's counsel characterized the defendant's confession as "dumb." *Id.* As the Supreme Court described, "The weight of defense counsel's closing, however, was devoted to explaining that it was difficult to find a reason why the jury should spare [the defendant's] life." *Id.*

The Supreme Court held that the performance of Williams's counsel during the penalty phase

constituted ineffective assistance, stating:

> The record establishes that counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abuse foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* at 395, 120 S.Ct. 1495.

Similarly, the testimony given during the penalty phase of Fugate's trial is more than the "hollow shell" presented in *Collier v. Turpin,* 177 F.3d 1184, 1201 (11th Cir.1999). In that case, defense counsel elicited testimony that the defendant "had a 'good' reputation, that he was generally known as a hard worker who took care of his family, and that he had a good reputation for truth and veracity." *Id.* This court stated, however, that counsel "presented almost none of the readily available evidence of Collier's background and character that would have led the jury to eschew the death penalty." *Id.* at 1202. We stated:

> Instead of developing an image of Collier as a human being who was generally a good family man and a good public citizen, who had a background of poverty but who had worked hard as a child and as an adult to support his family and close relatives, counsels' presentation tended to give the impression that the witnesses knew little or nothing about Collier. In failing to present any of the available evidence of Collier's upbringing, his gentle disposition, his record of helping family in times of need, specific instances of his heroism and compassion, and evidence of his circumstances at the time of the crimes—including his recent loss of his job, his poverty, and his diabetic condition—counsels' performance brought into question the reliability of the jury's determination that death was the appropriate sentence.

*Id.* (citing *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). In light of this unused mitigation evidence, we concluded that the assistance provided by the defendant's counsel was ineffective. *See id.*

The factual circumstances on which the conclusions of ineffective assistance of counsel were based in *Williams* and *Collier* are simply not present here. In those cases, defense counsel failed to present available compelling evidence that was substantively different from that actually presented at sentencing and that might have persuaded the jury to recommend a sentence of life in prison rather than the death penalty. The mitigating evidence that Fugate claims his counsel could have discovered and should have presented is of a much different character than that at issue in *Williams* and *Collier.* For example, there is no evidence that Fugate suffered the effect of an abusive or otherwise disruptive childhood like the defendant in *Williams.* In fact, testimony at the penalty phase in this case indicated quite the opposite. Likewise, there is no evidence

that Fugate emerged from a disadvantaged background or endured a series of unfortunate incidents of the sort that occurred just prior to the murder in *Collier*. Moreover, there is no evidence in this case that Fugate's counsel neglected to pursue certain avenues of investigation that would have produced valuable mitigation evidence. Rather, Bellury and Browne discussed, for example, the fact that Fugate had no prior criminal record—in fact, Bellury noted that this was so, without objection, during his closing argument.

In light of the foregoing, we hold that the performance of Fugate's attorneys during the penalty phase satisfied constitutional standards and constituted effective assistance of counsel.[55] We thus agree with the district court that 28 U.S.C. § 2254(d) precludes federal habeas relief in this case.

## VI. CONCLUSION

For the reasons stated explained herein, we AFFIRM the district court's rulings on Fugate's claims of ineffective assistance of counsel at both the guilt phase and the penalty phase of his trial.

AFFIRMED.

BIRCH, Circuit Judge, concurring specially:

I concur without reservation in Parts I-IV of the court's opinion. Although I remain convinced that our court set the acceptable level of attorney assistance for preparation for the penalty phase of a capital case too low in *Chandler v. United States,* 218 F.3d 1305, 1343-44 (11th Cir.2000) (*en banc* ) (dissent), *cert. denied,* --- U.S. ----, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), the panel majority has correctly applied that decision to the case at hand. Accordingly, I join Parts V and VI of the court's opinion.

---

[55]Because we conclude that the performance of Fugate's counsel did not constitute ineffective assistance during the penalty phase, we do not address at length the prejudice prong of the analysis. That issue, however, is not a close one given the substantial evidence and findings outlined in our discussion of the guilt phase.