[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11087

Non-Argument Calendar

_____

JOHN HAYWARD,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-00479-PGB-GJK

_____

Before ROSENBAUM, JILL PRYOR, and BRASHER, Circuit Judges.

PER CURIAM:

John Hayward, a Florida state prisoner proceeding *pro se*, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We granted a certificate of appealability on the issue of whether Hayward's trial counsel provided ineffective assistance by failing to adequately impeach the victim when she testified at trial. After careful consideration of the parties' briefs and the record, we affirm.

## I.

After Hayward's daughter, J.B., accused him of sexually abusing her, the State of Florida charged him with one count of sexual battery on a person less than 12 years old and two counts of lewd or lascivious touching of a person less than 12 years old by a person at least 18 years old. In this section, we review the proceedings in Hayward's criminal case and discuss his post-conviction proceedings in state and federal court.

## A.

In his Florida criminal case, Hayward pleaded not guilty and proceeded to trial. He was initially represented by a public defender. He later retained attorney Peter Zies, who represented him through trial.

22-11087                Opinion of the Court                3

The State's primary witness at trial was J.B.[1] She testified that in November 2005, when she was ten years old, she and her family—her father, Hayward; her mother, Christina Hayward; a younger brother; and three younger sisters—moved from Maine to Florida, where they lived for approximately a year. While in Florida, the family lived in a trailer. J.B. shared a bedroom with her younger brother; he slept on the top bunk while she slept on the bottom bunk or the floor.

J.B. testified that on multiple occasions while the family lived in Florida, Hayward entered her bedroom at night and "sexually touched" her. Doc. 17-2 at 207.[2] On some nights when the abuse occurred, J.B.'s brother was sleeping in the top bunk. But on other nights, he slept in a different bedroom with their mother.

J.B. described how Hayward committed the sexual abuse. After entering the bedroom, he climbed on top of J.B. He pinned her legs down and forced her to be quiet. He touched her vagina either with his penis or his hands. During these incidents, his penis did not enter her vagina. During some of the incidents, Hayward took her clothes off; other times, he left them on. On the occasions when his penis touched her vagina, J.B. was wearing her pajamas. She was unsure whether Hayward was wearing clothes during the incidents because it was dark in her room. But even in the dark

---

[1] The State's other witnesses were a Florida law enforcement officer who investigated J.B.'s allegations and a nurse practitioner from Maine who examined J.B.

[2] "Doc." numbers refer to the district court's docket entries.

room, J.B. was able to distinguish between when Hayward touched her vagina with his hands and his penis.

J.B. testified that Hayward told her not to tell anyone about the abuse. She did not report the abuse while the family lived in Florida because she was afraid of Hayward, who stored guns in a gun case in the family's trailer. She told the jury, "I was afraid that he might come after me." *Id.* at 215.

After living in Florida for about one year, Christina moved J.B. and her siblings back to Maine. Upon returning to Maine, they lived in a shelter for abused women. About a week after they returned to Maine, J.B. told Christina that Hayward had raped her in Florida. J.B. testified that she finally told her mother about the abuse because her mother had threatened to send her back to Florida to stay with Hayward.

Christina, in turn, reported J.B.'s abuse allegations to social workers and law enforcement. As part of the investigation into the abuse, J.B. gave statements to law enforcement officers and child welfare officials in both Florida and Maine. While in Maine, she underwent a medical exam. And she later sat for a deposition in which she described the abuse.

Within a few months of when J.B. reported the abuse, Christina and Hayward reunited, and the family moved back to Florida. In Florida, J.B. was interviewed by a caseworker from Florida's Department of Children and Families. In this interview, J.B. denied that Hayward had sexually abused her. At trial, J.B. told the jury that she lied to the caseworker when she said that no sexual abuse

occurred. She stated that Hayward; Christina; and her uncle, Norman Hayward, had pressured her to say that there was no abuse, telling her that unless she recanted her allegations, she and her siblings would be separated and never see each other again.

Zies cross examined J.B. at length. He asked questions suggesting it was impossible that Hayward had repeatedly sexually assaulted J.B. while her brother was asleep in a bunk above them. Zies asked J.B. whether she remained quiet during the incidents. J.B. answered that on some occasions she tried to loudly tell her father no, but he smacked her in the face.

Zies also questioned J.B. about the statement she gave to the Florida caseworker denying that any sexual abuse occurred. Although J.B. testified that her family pressured her to deny that any abuse occurred, she admitted on cross examination that she was alone with the caseworker when she recanted the abuse allegations.

Zies then brought up that after the family left Florida, J.B.'s parents had reunited. He asked J.B. whether "[a]nything else happen[ed]" after the family left Florida. *Id.* at 240. J.B. hesitated and then answered "[n]o." *Id.*

The prosecutor requested a sidebar conference. She told the judge that Hayward had a separate criminal case pending in Maine arising out of allegations of abuse that occurred while the family

lived there.[3] She explained that she had instructed J.B. not to testify "about anything that happened in Maine." *Id.* at 241. The prosecutor was concerned that J.B. might have hesitated and answered no because of the instruction not to talk about what occurred in Maine. The prosecutor requested a short recess to speak with J.B. and tell her that "if something happened" after the family returned to Maine, she needed to say so. *Id.*

After a short recess, Zies resumed his cross examination. He asked J.B. whether "any further sexual abuse" occurred after the family left Florida and returned to Maine. *Id.* at 243. J.B. answered, "No, sir." *Id.*

Zies also questioned J.B. about her testimony that she feared Hayward because he had guns in the trailer. Zies asked J.B. where the gun cabinet was located. She answered that it was in Hayward's bedroom.

The cross examination also covered statements J.B. made during an interview with a law enforcement officer in Maine. Zies asked J.B. whether she remembered telling the officer that "sexual contact had taken place twice" in Florida. *Id.* at 247. She answered, "[y]es." *Id.* at 248. He then asked whether she recalled later in the

---

[3] The record does not reflect whether the Maine criminal case arose out of abuse that allegedly occurred when the family first lived in Maine or after they returned from Florida. In interviews with law enforcement, J.B. reported that Hayward had been sexually abusing her since she was six years old, meaning she maintained that the abuse began before the family moved to Florida.

same interview saying that sexual contact occurred only "one time in Florida." *Id.* J.B. responded that she did not recall saying that.

The prosecutor requested another sidebar. She argued that Zies had mischaracterized J.B.'s statements in the interview. She explained that the transcript from the interview showed that J.B. had told the officer that Hayward had "anally penetrated her two times up in Maine"[4] but also reported that Hayward had "touched [her] privates . . . more than 20 times." *Id.* at 249–50.

The court allowed the prosecutor to conduct a redirect examination. On redirect, J.B. clarified that in the interview with the Maine officer, she reported that Hayward had touched her private areas more than 20 times.

Zies then asked to cross-examine J.B. again about the interview with the officer in Maine. The court denied the request, stating the subject had "already been brought out on cross-examination" and Zies "already had that testimony or similar testimony before this jury." *Id.* at 260–61.

After the prosecution rested, Hayward called several witnesses to testify in his defense. The witnesses included Christina, as well as Norman and Norman's wife, Jo Elaine Sapp. Hayward also testified in his own defense.

_____

[4] In the interview, J.B. reported that these incidents of anal rape occurred when she was seven or eight years old, meaning they occurred when the family initially lived in Maine, before moving to Florida, not after they moved back to Maine.

Christina told the jury about J.B.'s relationship with Hayward. She stated they initially had a great relationship but reported that things changed after J.B.'s brother was born. Hayward favored his son, which made J.B. "very jealous" and "very angry." *Id.* at 314, 316. Christina testified that shortly before reporting the abuse, J.B. stated that she did not want to live with her siblings anymore and wanted to be an only child.

Christina told the jury that she had never seen signs of sexual abuse or anything that made her suspicious of Hayward. According to Christina, J.B. told her of the abuse after she stated that Hayward was coming to Maine for a visit. Upon hearing about seeing her father, J.B. began to cry, hid under the covers in a bed, and then told Christina that "her father ha[d] been raping her." *Id.* at 352.

When J.B. first reported the abuse, Christina "believed her 110 percent." *Id.* at 319. In fact, Christina reported to law enforcement that Hayward confessed to her that he had sexual contact with J.B. In a written statement given to law enforcement, Christina reported that Hayward told her that he had "rubbed his penis on [J.B.'s] vagina." *Id.* at 367. But at trial Christina testified that she had fabricated Hayward's confession. She told the jury that she made up the confession after a law enforcement officer directed her to get a confession from Hayward.

Christina testified that she later discovered that J.B. made up the accusations against Hayward. About six months after J.B. reported the abuse, Christina tried to have J.B. attend a counseling session related to the sexual assault. J.B. told Christina that she did

not need to attend the session because there had never been any sexual abuse. According to Christina, J.B. stated that she lied because she was angry that her brother was getting too much attention.

On direct examination, Zies asked Christina whether Hayward owned guns. Although J.B. had testified that Hayward kept guns in the trailer, Christina testified that he had never owned any guns.

The prosecutor extensively cross-examined Christina. She probed whether Hayward had ever abused other family members. Christina answered that Hayward had been emotionally abusive to her but denied that he was physically abusive. The prosecutor then reminded Christina that she had previously told a law enforcement officer that she had moved to the domestic violence shelter in Maine because she was tired of Hayward "smacking me [and] hitting me" and because he had "started hitting the kids." *Id.* at 343. Christina then stated that she did not remember whether Hayward had hit her while they lived in Florida but admitted that it was "possible."[5] *Id.* at 345. Christina also admitted that after J.B. reported the abuse, she obtained a protective order that required Hayward to stay away from the children.

---

[5] In her testimony, Christina often had trouble remembering when events occurred. She told the jury that she had been in a car accident that left her with memory issues.

Christina also was asked on cross-examination about her testimony that J.B. admitted to making up the story of the abuse. Christina acknowledged that after J.B. supposedly recanted her story, Christina lost custody of her. Christina conceded that even during the process of losing custody of her child, she never went to law enforcement or a caseworker to report that J.B. had admitted to making up the story of the abuse.

Norman also testified about Hayward's relationship with J.B. He stated that Hayward and J.B. had an excellent relationship for the first five years of her life. But, according to Norman, the relationship changed after J.B.'s brother was born, and J.B. "hated" her brother. *Id.* at 414.

Norman also testified that J.B. admitted to him that she had made up the sexual abuse allegations against Hayward. He stated that around the time J.B. admitted to the Florida caseworker that she had made up the abuse allegations, she made a similar confession to him. Norman stated that J.B. made this admission when they took a walk outside. He denied coercing or threatening J.B. into recanting the allegations. On cross examination, Norman admitted that he never went to law enforcement or the prosecutor to tell them that J.B. recanted.

Sapp gave similar testimony. She testified that before J.B. made the allegations against her father, she was unhappy living with her family and wanted to move away from them. After J.B. reported the abuse, Christina and her children, including J.B., briefly lived with Sapp and Norman. Sapp testified that during this

time J.B. told Sapp that she had made up the allegations against her father. On cross-examination, Sapp conceded that the only people she told about J.B. recanting were Hayward, Norman, and Hayward's attorney and admitted that she never told law enforcement about it.

Hayward testified in his own defense. He admitted that there was yelling and screaming in his home but denied sexually abusing J.B. He also denied that there was any domestic violence in the home.

Hayward suggested that J.B. made up the abuse allegations because she was angry with him for moving the family from Maine to Florida and making her leave her friends. He testified that she had previously threatened him by saying, "I'll get back at you someday." *Id.* at 460.

According to Hayward, J.B. admitted to the family that she made up the abuse allegations. He stated that after J.B. recanted, Christina allowed him to visit the family in Maine. According to Hayward, on this visit, J.B. told him that "she was sorry that she lied and . . . that her and mom had cleared it up with DHS and the police, and that, um, she did it out of anger." *Id.* at 461. Hayward told the jury that he had told his first attorney, who represented him for over a year, that J.B. recanted and that he had expected the attorney to bring it to the State's attention.

Hayward was asked about his gun ownership. He testified that while the family lived in Florida he did not possess any hunting rifles or keep any in his home. And he stated that he never owned

any handguns. He admitted that he owned a hunting rifle while the family lived in Maine but said that he stored the weapon at his cousin's house to keep it away from his children.

During closing arguments, Zies argued to the jury that the State had not proven beyond a reasonable doubt that sexual abuse had occurred. Although J.B. had testified about the abuse, Zies told the jury that she was not a credible witness. He asserted that on direct examination J.B. had testified calmly, but that when she was asked questions on cross-examination, she became upset. Zies argued that this change in demeanor showed that J.B. was lying about the abuse.

Zies also pointed to inconsistencies in J.B.'s testimony. He argued that it was not believable that J.B.'s brother remained asleep in a top bunk while Hayward raped her on multiple occasions, asking "who's going to sleep through that?" and "how on God's green earth is the child going to sleep through it 20 times with her loudly saying no, no, and him smacking her and the child never waking up?" *Id.* at 506–07. Zies also focused on J.B.'s testimony that she lied to the Florida social worker when she stated no abuse occurred. Zies argued, "[S]he admitted she's a liar." *Id.* at 507. He suggested that J.B. made up a story about sexual abuse to get a "new family" and "a new home." *Id.* at 508.

After closing arguments and outside the presence of the jury, the trial judge asked Hayward whether he was pleased with Zies's performance. Hayward said that he was. The court asked whether there was anything Hayward could "think of that . . . Zies did not

do that [Hayward] would have liked for him to have done," and Hayward responded there was not. *Id.* at 552.

The jury convicted Hayward of one count of sexual battery on a person less than 12 years old and one count of lewd or lascivious molestation of a person less than 12 years old. The court sentenced him to life imprisonment.

Hayward appealed, arguing that he was deprived of a fair trial because of comments the prosecutor made during closing argument. Florida's Fifth District Court of Appeal affirmed in a summary decision.

**B.**

Hayward later pursued post-conviction relief. In Florida state court, he filed a Rule 3.850 motion seeking to vacate and set aside his convictions. He argued, among other things, that he received ineffective assistance at trial when Zies failed to impeach J.B. with prior inconsistent statements. He asserted that Zies should have raised the following instances when J.B. allegedly gave inconsistent statements:

- in an interview with a medical examiner in Maine, J.B. reported that the sexual abuse Hayward inflicted included genital-to-genital penetration, anal penetration, and oral sex, but she did not testify at trial that he engaged in these acts;

- in an interview with an examining physician in Maine, J.B. reported that Hayward "put his privates inside of her

privates," Doc. 17-2 at 630 (internal quotation marks omitted), but she denied at trial that Hayward had engaged in genital-to-genital sexual penetrative contact;

- in an interview with Detective Caron in Maine, J.B. reported that Hayward twice forced her to have anal sex, but she did not reference these acts at trial;

- in an interview with Detective Caron, J.B. reported that Hayward took off his underwear and was sometimes naked during the sexual abuse, but she testified at trial that she did not know whether he was ever naked during the sexual abuse;

- in an interview with Detective Caron, J.B. initially reported that Hayward said nothing after the assaults and later stated that he apologized after the last assault, but she testified at trial that Hayward sometimes apologized to her after the assaults;

- in an interview with Detective Caron, J.B. stated that her father had access to guns at his uncle's house, but she testified at trial that Hayward kept guns at the family's trailer; and

- J.B. told an aunt that when Hayward anally raped her, Christina was either shopping or in the kitchen doing dishes, but J.B. testified at trial that when Hayward sexually abused her, her mother was asleep in a bedroom.

Hayward alleged that Zies's failure to cross-examine J.B. about these inconsistencies constituted deficient performance.

Hayward also alleged in his post-conviction motion that he received ineffective assistance of counsel because Zies failed to object to the improper admission of collateral crimes evidence. Although the indictment alleged that Hayward engaged in only two discrete acts of abuse, at trial, J.B. testified in general about repeated abuse that she suffered. According to Hayward, Zies rendered deficient performance in failing to exclude J.B.'s testimony about these other uncharged acts.

After reviewing the parties' written submissions and without holding an evidentiary hearing, the state court denied Hayward's post-conviction motion. It rejected the claim that Zies was ineffective because he failed to cross examine J.B. about her inconsistent statements, concluding Hayward had not demonstrated prejudice. It explained that the jury was already aware of the "inconsistencies in the victim's story, possible motives for fabrication, and that the victim had previously recanted." *Id.* at 962. The state court also denied relief on the claim that trial counsel was ineffective in failing to object to evidence about other instances of abuse, again concluding that Hayward failed to show prejudice.

Hayward appealed. In a short opinion, Florida's Fifth District Court of Appeal affirmed in part and reversed in part. It summarily affirmed the denial of the claim that trial counsel was ineffective in failing to cross examine J.B. about her allegedly inconsistent statements. But it reversed the denial of Hayward's claim

"that counsel was ineffective for failing to object to the admission of collateral crimes evidence." Doc. 17-3 at 68. It remanded for the state court to hold an evidentiary hearing on that issue.

On remand, the state court held the evidentiary hearing. Zies testified about his representation of Hayward. He explained that throughout the representation Hayward was adamant that he had not sexually abused J.B. The strategy at trial was for Zies to point out inconsistencies in J.B.'s testimony and "to explain what he perceived to be her motivations for fabricating." *Id.* at 550. Zies stated that the defense strategy, to which Hayward agreed, was to let J.B. say as many things as possible at trial and then demonstrate that her accounts were inconsistent. Although he wanted to raise inconsistencies, Zies testified that he also was being careful not to open the door to allow J.B. to testify about abuse that allegedly occurred in Maine.

At the evidentiary hearing, Hayward also testified. He denied agreeing to a strategy in which Zies "would elicit testimony that the alleged victim . . . claimed [Hayward] touched her on multiple occasions." *Id.* at 565.

After the hearing, the state court entered a written order denying Hayward relief on his claim that trial counsel was ineffective in allowing the admission of evidence of other uncharged acts. It determined that Hayward had not established deficient performance or prejudice. It found that Zies had "testified credibly that [Hayward] wanted him to present all of the victim's inconsistencies to the jury and that [he] was in agreement with the trial strategy to

22-11087            Opinion of the Court            17

allow the victim to amplify rather than limit the alleged incidents, in order to impeach the victim with multiple inconsistencies." Doc. 1-3 at 2. It explained that the chosen "theory of defense also included allowing the victim to testify to multiple allegations because the defense could argue that it was a physical impossibility that the crimes occurred, as the victim's younger brother would have woken up at some point during repeated offenses." *Id.* at 2–3. The court found not credible Hayward's testimony that he did not agree to the trial strategy. Hayward appealed this denial, but a Florida appellate court affirmed in a summary decision.

## C.

Hayward, proceeding through counsel, then filed a federal habeas petition in which he alleged that trial counsel was ineffective in failing to impeach J.B. with her inconsistent statements.

The district court denied the petition. It explained that Hayward had raised this claim in his state court post-conviction motion, the state court had summarily denied relief because he had not demonstrated prejudice, and a Florida appellate court had affirmed. The district court determined that the state court decision was entitled to deference. It explained that Zies had presented the defense theory that J.B. had fabricated the allegations of sexual abuse and was not a reliable witness. It pointed out that he had impeached J.B. by confronting her with inconsistent statements.

The court acknowledged that Zies failed to impeach J.B. with earlier statements in which she reported that additional sexual abuse occurred in which Hayward penetrated her vagina or anus.

But it explained that J.B. did not testify that such abuse occurred on direct examination and "the lack of testimony regarding penetration was beneficial to" Hayward. Doc. 43 at 13. The court also observed that Zies failed to impeach J.B. with statements that conflicted with her trial testimony about "whether [Hayward] was wearing clothing when the abuse occurred," whether [he] actually apologized, or [where her] mother was located during the incidents." *Id.* at 12. But it explained that these issues "were not material to the case." *Id.* at 12–13. It ultimately concluded that there was "no indication that additional impeachment would have changed the outcome of the trial." *Id.* at 13.

Hayward, proceeding *pro se*, appealed. A member of this court granted him a certificate of appealability on the question of whether Zies "provided ineffective assistance . . . by failing to impeach the victim with her inconsistent statements?"[6]

## II.

We review *de novo* a district court's denial of a petition for a writ of habeas corpus. *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018).

---

[6] In his appellate brief, Hayward challenges other aspects of Zies's performance. For example, he complains that Zies should have deposed or called J.B.'s brother as a witness at trial and should have objected when the prosecutor asked J.B. leading questions on direct examination. Because these issues are outside the scope of the certificate of appealability, we do not address them.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review of federal habeas petitions. *See* 28 U.S.C. § 2254(d). "AEDPA prescribes a highly deferential framework for evaluating issues previously decided in state court." *Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023). It bars a federal court from granting habeas relief on a claim that was "adjudicated on the merits in [s]tate court" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

### III.

The United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance was deficient and (2) he was prejudiced by the deficient performance. *Id.* at 687. A court deciding an ineffective assistance claim need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

Here, we need not decide whether the state court decision summarily denying Hayward's claim that counsel was ineffective

in failing to impeach J.B. with her inconsistent statements is entitled to deference because even if this claim was "eligible for *de novo* review, it would still fail." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir. 2012) (explaining that, even when it is clear that AEDPA deference applies, we may affirm the denial of federal habeas relief based solely on *de novo* review). Hayward's claim would fail under *de novo* review because he failed to establish that his counsel performed deficiently.

To establish that counsel performed deficiently, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This determination is based on "reasonableness under prevailing professional norms." *Id.* Trial counsel's performance is entitled to a presumption of reasonableness; to overcome that presumption a petitioner must show that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). A court evaluates "the reasonableness of the challenged conduct on the facts of the particular case, viewed as of the time of the conduct." *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989). "A tactical decision by counsel will almost never be overturned by habeas corpus." *Id.*

The decision whether to cross-examine a witness is a tactical one, well within a defense attorney's discretion. *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001). In Florida, a witness may be impeached with an earlier statement that is inconsistent with her

testimony at trial. Fla. Stat. Ann. § 90.608(1). An attorney performs deficiently if he "sacrifice[s] an opportunity to weaken the star witness's inculpatory testimony" by failing to impeach the witness with a prior inconsistent statement that was "much more favorable to [the defendant]." *Nixon*, 888 F.2d at 115. But a court may not find deficient performance simply "because other testimony might have been elicited from those who testified." *Fugate*, 261 F.3d at 1220 (internal quotation marks omitted); *see Alderman v. Terry*, 468 F.3d 775, 792 (11th Cir. 2006) ("There is not one 'correct' way for counsel to provide effective assistance."). We have recognized that "[c]laims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance," particularly when the attorney was able to challenge the witness's credibility in other ways. *Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001).

Here, we conclude that Hayward did not meet the first prong of *Strickland*'s test because he failed to show that counsel performed deficiently. Importantly, Zies succeeded at trial in impeaching J.B. and attacking her credibility. He brought up the interview when she told a Florida caseworker that Hayward had never abused her. He elicited testimony from Hayward, Christina, Norman, and Sapp that J.B. told each of them that she had not been sexually abused and had made up the allegations. And he cast doubt on J.B.'s testimony that Hayward kept guns in the trailer in Florida with testimony from Hayward and Christina that there were no guns in the trailer.

Hayward nevertheless argues that Zies performed deficiently because he failed to cross-examine J.B. about additional inconsistent statements. He says that Zies should have introduced earlier statements in which J.B. reported that the sexual abuse included genital-to-genital penetration, anal penetration, and oral sex. On direct examination, J.B. did not testify that such abuse occurred, and the absence of this testimony benefited Hayward. Competent counsel could have concluded that there was a tactical advantage in keeping the jury from hearing this information. Put another way, although Zies failed to impeach J.B. with these earlier inconsistent statements, he did not perform deficiently because the inconsistent statements were much more inflammatory and thus potentially damaging to Hayward. *See Nixon*, 888 F.2d at 115–16.

Hayward also says that Zies should have impeached J.B. with the following statements: (1) J.B. testified at trial that her mother was asleep when the abuse occurred but told her aunt that her mother was either shopping or in the kitchen when Hayward anally raped her; (2) J.B. testified at trial that she did not know whether Hayward was wearing clothes during the sexual abuse but told a law enforcement officer that on some occasions Hayward was naked when the abuse occurred; (3) J.B. testified at trial that on several occasions Hayward apologized after sexually abusing her but told a law enforcement officer that Hayward either never apologized or apologized only after the last incident when he sexually abused her; and (4) J.B. testified at trial that Hayward kept guns in a cabinet in the family's Florida trailer but told a law enforcement officer that Hayward's guns were at an uncle's house. After

reviewing the record and the various other ways that Zies attacked J.B.'s credibility, we cannot say that no competent counsel would have decided not to impeach J.B. with these statements, which were about immaterial matters. *See Chandler*, 218 F.3d at 1315. Accordingly, we conclude that Zies did not perform deficiently.

Because Hayward failed to demonstrate deficient performance, his ineffective assistance claim fails. We affirm the district court's denial of Hayward's § 2254 petition.

**AFFIRMED.**